In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1924

DARNELL TOLLIVER,

*Plaintiff-Appellant*,

*v.*

CITY OF CHICAGO, et al.,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:11-cv-008563 — **Andrea R. Wood**, *Judge*.

ARGUED DECEMBER 11, 2015 — DECIDED APRIL 12, 2016

Before KANNE, ROVNER, and HAMILTON, *Circuit Judges*.

ROVNER, *Circuit Judge*. After pleading guilty to aggravated battery to a peace officer, Darnell Tolliver brought claims against the arresting officers for excessive force and conspiracy to conceal the use of excessive force, and a claim against the City of Chicago for indemnification of the officers. The district court granted summary judgment in favor of the defendants on the ground that Tolliver's claims were barred by *Heck v.*

*Humphrey*, 512 U.S. 477 (1994). Although it is certainly possible in the abstract for a claim of excessive force to survive *Heck*, Tolliver's suit rests on a version of the event that completely negates the basis for his conviction. His claim is therefore barred by *Heck* and we affirm.

## I.

The facts are hotly disputed but we must credit Tolliver's version and draw all reasonable inferences in his favor because he is the party opposing summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *McGreal v. Ostrov*, 368 F.3d 657, 663 (7th Cir. 2004). In the evening of December 9, 2009, Tolliver drove to the home of his friend Kenyata Tyson, near the intersection of Wabansia Avenue and Mobile Avenue in Chicago. Tolliver had received a call earlier that evening from Tyson's girlfriend, asking for money to help Tyson retrieve his car from the auto pound. Tolliver went into Tyson's house and handed over the requested money. He also agreed to deliver drugs for Tyson and left the house with a package of cocaine in his coat pocket. He returned to his white Mitsubishi and pulled out onto Wabansia Avenue.

Unbeknownst to Tolliver, at roughly the same time, a confidential informant was telling a Chicago police sergeant that people were packaging drugs at a house on Wabansia with a white Mitsubishi parked outside. When Tolliver was leaving the house, the sergeant received another call informing him that someone was leaving in the white Mistubishi. The sergeant directed two officers on his gang team, Gregory Sobieraj and Marc Debose, to stop the car. Officers Sobieraj and Debose

saw the car at the intersection of Wabansia and Moody[1] and pulled their unmarked Ford Crown Victoria in front of and perpendicular to the Mitsubishi to effect the stop.

Both officers, who were in plain clothes, exited the car, but Tolliver saw only Officer Sobieraj, who exited the driver's side and immediately pointed a gun at Tolliver. Because the car was unmarked and lacked police mars lights, and because the officers were in plain clothes, Tolliver did not immediately realize that the men were police officers. He put his car in reverse and slowly backed up a little more than a car length. When he looked forward again, Tolliver realized from Sobieraj's demeanor that he was a police officer. Because he did not want the officer to think that he was reaching for a gun, Tolliver (who was unarmed) then sat motionless in the car, with his hands on the steering wheel in the 10 o'clock and 2 o'clock position, and his foot on the brake, for approximately thirty seconds. He could tell that the man with the gun was shouting but he could not hear the words because music was playing in the car.

After sitting motionless for thirty seconds, with the car stationary and the gearshift still in reverse, Tolliver felt something hit him in the chest. He looked down and realized

---

[1] At Tolliver's plea hearing, the State's version of the event placed the incident at the intersection of Wabansia and Moody. Tolliver stated that Tyson's home was on Wabansia, and although he was not certain of the cross-street, he believed it was Mobile. Tolliver also stated that he was traveling east on Wabansia when the officers stopped him. Moody is approximately six blocks east of Mobile. The precise location of the shooting is immaterial to the issues on appeal.

he had been shot. When he felt the bullet enter his chest, he "ducked down to the right" (R. 33-1 at 65) or "fell to the right" (R. 33 at ¶ 26) and "couldn't move." R. 33-1 at 66. *See also* R. 33 at ¶ 26 ("After Tolliver was shot the first time, he felt as if he could not move and fell to the right as his car started moving forward."); R. 33-1 at 66-67 (clarifying that he could not move anything once the bullet hit him, and recalling that he fell to the right). Tolliver testified that after he felt the first bullet strike him, he "just felt like [he] was paralyzed," and that he could not move anything but his eyeballs. R. 33-1 at 66. He could not move his left side at all and he was lying on his right side, with his right arm trapped beneath him. R. 33-1 at 69. His body was "stuck in the middle [of the center console], under the steering wheel, in between … the gear shift … and … the little panel part right in the middle." R. 33-1 at 69-70. After that point, he could not touch the steering wheel because he could not move his left side and he was lying on his right side. R. 33-1 at 68-71. From that position, he felt the car roll forward for a few seconds until it hit something and then stopped rolling. R. 33-1 at 67, 72-73. Tolliver asserted that he "did not intentionally put [the car] in drive," but that a reasonable inference "is that the car was knocked into drive when Tolliver fell over to the right as he was shot since the gear shift is floor mounted in the center console." R. 32, at ¶ 32. He did not know whether the car was rolling forward in a straight path but knew only that it was coasting forward. R. 33-1 at 68. He denied driving the car toward the officer (R. 33-1 at 101) but assumed that the car went toward the officer because it was rolling forward after he was shot. R. 33-1 at 104. After the Mitsubishi came to rest, someone then pulled him from the car

and laid him on the ground where he "felt like [he] went to sleep." R. 33-1 at 79.

Although he never heard a gun being fired, Tolliver eventually learned that the officers had fired fourteen times and he had been struck by seven bullets which caused serious and enduring physical and emotional injuries. The second shot hit him in the shoulder, back-to-back with the first. R. 33-1 at 63-64, 70. More shots followed, hitting his left shin bone, thigh, inner left thigh, buttocks, chest and shoulder blade. He underwent surgery five times in efforts to repair the damage but suffers from lasting injuries. Tolliver asserts that before the shooting and at the time of the shooting, he posed no danger or threat of danger to either officer. Tolliver does not dispute that Officer Sobieraj was injured during the incident, spraining his ankle. As we noted above, Tolliver also claims not to have intentionally driven the car towards the officers and that he was paralyzed from the moment of the first unprovoked shot.

Nevertheless, he pled guilty to state charges of aggravated battery of a peace officer and possession of a controlled substance with intent to deliver. At his plea hearing, Tolliver stipulated that, if the matter proceeded to trial, Sobieraj would testify that:

> he was working and on duty on December 9th of 2009 at approximately 11:14 P.M. He would testify that he was in the area of Waubansia [sic] and Moody Avenue in Chicago, Cook County, Illinois, on a narcotics surveillance. He would testify that he observed the Defendant, whom he would iden-

tify in open court, driving a vehicle. The officer would testify that he attempted to curb that vehicle, and he exited his vehicle and approached the vehicle the Defendant was driving. He would testify at that time that the Defendant drove his vehicle towards the officer, and in an attempt to escape from the Defendant's vehicle, Officer Sobieraj did fall and sprain his ankle. He would further testify that he was in fear for his safety, and he fired shots at the vehicle striking the Defendant. He would further testify that after the Defendant's vehicle crashed, the Defendant was placed in custody, and a custodial search of the Defendant was performed, which revealed 278 plastic clear plastic [sic] baggies with white chunky substance inside them.

R. 26-4, at 8-9.

After entering his guilty plea, Tolliver filed a three count complaint against Officers Sobieraj and Debose and the City of Chicago, claiming that the officers violated his civil rights by using excessive force and by conspiring to conceal their use of excessive force. The claim against the City is limited to indemnification of the officers. The district court concluded that the claim for excessive force is barred by *Heck*, and that the other two claims fail because they are entirely dependent on the success of the first. Tolliver appeals.

## II.

We review the district court's grant of summary judgment *de novo*, examining the record in the light most favorable to Tolliver and construing all reasonable inferences from the evidence in his favor. *Anderson*, 477 U.S. at 255; *Naficy v. Illinois Dep't of Human Servs.*, 697 F.3d 504, 509 (7th Cir. 2012); *Norman-Nunnery v. Madison Area Technical Coll.*, 625 F.3d 422, 428 (7th Cir. 2010). Summary judgment is appropriate when there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Naficy*, 697 F.3d at 509.

Under Tolliver's theory of the case, the officers used excessive force in shooting him before his car began moving and in continuing to shoot him as his car rolled slowly in the direction of Sobieraj. The district court granted judgment in favor of the defendants after concluding that Tolliver's claims were barred by *Heck*. In that case, the Supreme Court held:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing

that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated. But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

*Heck*, 512 U.S. at 486–87 (footnotes omitted). The question for Tolliver, then, is whether his civil claims against the officers necessarily imply the invalidity of his criminal conviction. *See also Okoro v. Callaghan*, 324 F.3d 488, 489 (7th Cir. 2003) (a convicted criminal may not bring a civil suit questioning the validity of his conviction until the conviction has been set aside).

Tolliver pled guilty to aggravated battery of a peace officer. In Illinois, "[a] person commits aggravated battery when, in committing a battery, other than by the discharge of a firearm, he or she knows the individual battered to be … [a] peace officer … performing his or her official duties." 720 ILCS 5/12-

3.05(d)(4)(I).[2] In turn, "[a] person commits battery if he intentionally or knowingly without legal justification and by any means, (1) causes bodily harm to an individual or (2) makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3.[3] Illinois law also provides that "[a] material element of every offense is a voluntary act, which includes an omission to perform a duty which the law imposes on the offender and which he is physically capable of performing." 720 ILCS 5/4-1. Thus, in order to be guilty of aggravated battery to a peace officer, Tolliver must have (1) known that Sobieraj was a peace officer performing his official duties; and (2) intentionally or knowingly; (3) voluntarily; (4) without legal justification; (5) caused bodily harm to Officer Sobieraj.

In Tolliver's current version of the shooting, he concedes that he knew that Sobieraj was a peace officer performing his duties and that Sobieraj was injured when he attempted to move away from Tolliver's car as it rolled towards him. But Tolliver's version of the event denies any act that was knowing, intentional, voluntary and lacking legal justification that

---

[2]  At the time of the shooting, section 720 ILCS 5/12-4(b)(18) provided that, "[i]n committing a battery, a person commits aggravated battery if he or she … Knows the individual harmed to be an officer or employee of the State of Illinois, a unit of local government, or school district engaged in the performance of his or her authorized duties as such officer or employee." That provision was amended and renumbered as quoted above but the changes are not relevant to the issues on appeal.

[3]  This is the version of the statute in effect at the time of the offense. A new version took effect on July 1, 2011.

caused the harm to Officer Sobieraj. Instead, Tolliver affirmatively asserts that he did not intentionally drive the car towards the officers, and that after the first, unprovoked shot, he was paralyzed, fell over, and could not see what was happening. He argues that it is reasonable to infer that he knocked the gear shift into a forward gear when he fell or "ducked" to the right after being shot, and he assumes his car drifted towards the officers.

Without any acknowledgment of the mental state necessary for a conviction for aggravated battery, Tolliver's version of the shooting thus implies the invalidity of his conviction. That is, if the finder of fact were to accept his version of the event, the officers shot him as he sat impassively in his car, posing no threat to the officers. By his own account, the first shot that he felt caused him to fall to the right, paralyzing his left side, trapping his right arm, and rendering him unable to move anything but his eyeballs. He could not see where the car was going and could not direct its path or do anything to stop it. He urges the court to interpret his statement that he "ducked" to the right as the voluntary and intentional act that caused harm to Officer Sobieraj. But even if he voluntarily ducked to the right, and that action shifted the car into gear and caused it to roll towards the officers, he has affirmatively denied intent and knowledge of what happened next. Moreover, he would have been legally justified in ducking if, as he also claims, he was sitting impassively posing no threat to the officers when they began to shoot him, even if the action of ducking then caused injury to the officer. *See* 720 ILCS 5/7-13 (delineating the defense of necessity). Under Tolliver's version of the facts, he could not be guilty of aggravated battery because he did not

intentionally drive towards the officers, did not knowingly roll towards them, could not have stopped the car if he wanted to, and placed the car into a forward gear through an act that can be described as voluntary only if the finder of fact ignores the majority of his deposition testimony. Moreover, in light of all of his repeated testimony regarding falling to the right and immediate paralysis, it is not reasonable to construe the phrase "I ducked down to the right" as a voluntary act much less a voluntary act that knowingly caused the injury to Sobieraj. Because his version of the facts implies the invalidity of his conviction for aggravated battery, his civil claims are barred by *Heck*.

We note that there is nothing inherently contradictory about pleading guilty to aggravated battery of a peace officer and bringing a claim of excessive force. In Illinois, a person may be guilty of aggravated battery of a peace officer for either causing bodily harm to an officer or making physical contact of an insulting or provoking nature with an officer. 720 ILCS 5/12-3. Thus, a person could theoretically be found guilty of aggravated battery for crumpling up a parking ticket and throwing it at the officer's foot, *Garcia-Meza v. Mukasey*, 516 F.3d 535, 538 (7th Cir. 2008), or poking a police officer in the chin, *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008). If a police officer responded to those relatively minor insults with deadly force, a claim for excessive force would not be barred by *Heck* simply because the offender pled guilty to aggravated battery of a peace officer. A civil suit for excessive force in those circumstances would not imply the invalidity of the conviction.

But if the plaintiff's factual claims in the civil suit necessarily imply the invalidity of the criminal conviction, then *Heck* bars the civil suit. We explained the distinction in *Okoro*. In that case, a federal prisoner brought a suit against federal and state officers, seeking the return of gems and cash that he claimed the officers took from him in the course of a search of his home. Okoro had been arrested in his home on suspicion of distributing heroin, and it was during a search incident to his arrest that the defendants allegedly stole the gems and cash from him. In his civil suit, he insisted that he was not trying to sell heroin to the officers, as they had testified. Instead, he asserted, he was trying to sell them gems and the officers stole them. If his version of the event was true, then he was convicted in error because the officers' testimony about the heroin was an essential part of the evidence against him in his conviction. We noted that if he could not prevail in his claim for the return of the gems without undermining his conviction, then he was barred by *Heck* until he had his conviction overturned:

> It is irrelevant that he disclaims any intention of challenging his conviction; if he makes allegations that are inconsistent with the conviction's having been valid, *Heck* kicks in and bars his civil suit. *Edwards v. Balisok*, 520 U.S. 641, 646–48, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997); *Ryan v. DuPage County Jury Commission*, 105 F.3d 329, 330–31 (7th Cir. 1996) (per curiam). He is the master of his ground.

*Okoro*, 324 F.3d at 490. Okoro could have said the officers took his gems without making any claim about heroin, or he could have said that they took both the heroin and his gems, and

neither of those scenarios would have implied the invalidity of his conviction. But instead he challenged the validity of the guilty verdict by denying that there were any drugs and instead arguing that he was framed. His civil claims were therefore barred by *Heck*. *Okoro*, 328 F.3d at 490.

Tolliver's conviction was based on voluntarily, and knowingly or intentionally causing bodily harm to Officer Sobieraj, without legal justification. But if the incident unfolded as Tolliver alleges in his civil suit, then he could not have been guilty of aggravated battery of a peace officer because the officer shot him without provocation and was injured as a result of involuntary and unintentional actions by a paralyzed Tolliver. Because Tolliver is the master of his ground, and because the allegations he makes now necessarily imply the invalidity of his conviction, *Heck* bars his civil suit. *Okoro*, 324 F.3d at 490.

Tolliver could have brought a suit for excessive force that occurred after the crime was complete. *Gilbert v. Cook*, 512 F.3d 899, 901 (7th Cir. 2008) (*Heck* does not affect litigation about what happens after the crime is completed). As we explained in *Gilbert*, a contention that a guard struck back after being hit is not incompatible with *Heck*. "Otherwise guards (and for that matter any public employee) could maul anyone who strikes them, without risk of civil liability as long as the private party is punished by criminal prosecution or prison discipline for the initial wrong." *Gilbert*, 512 F.3d at 901. If Tolliver had conceded that he voluntarily and intentionally or knowingly drove towards the officers, or if Tolliver had even remained agnostic on who struck the first blow, he could have brought a claim that the officers' response of firing fourteen bullets at him

constituted excessive force and that claim[4] would not be barred by *Heck*. *Gilbert*, 512 F.3d at 902. But Tolliver's version of events negates the mental state necessary to support his conviction for aggravated battery of a peace officer and thus necessarily implies the invalidity of his conviction.

The district court relied entirely on *Heck* in ruling for the defendants, declining to address their alternative argument that they were also entitled to qualified immunity for the shots fired once Tolliver's car began to move towards them. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Supreme Court has held that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).[5] *See also Bell v. Irwin*, 321 F.3d 637, 639 (7th

---

[4] We offer no opinion on the merits of such a claim. We note only that it would not be barred by *Heck*.

[5] The Court noted that, when deadly force is used to prevent escape in circumstances where a suspect has threatened an officer with a weapon, a warning should be given first when feasible. *Garner*, 471 U.S. at 11–12. Although Tolliver asserts that he was shot without warning, he also concedes that the officers were pointing their weapons at him for at least thirty seconds and that they were shouting at him. But he alleges that he

(continued...)

Cir. 2003). If a suspect threatens the officer with a weapon, that risk of serious physical harm has been established. *Garner*, 471 U.S. at 11. In assessing whether force was excessive, we must analyze the actions of the officer from the objective perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Scott v. Edinburg*, 346 F.3d 752, 756 (7th Cir. 2003). Moreover, the reasonableness calculus must allow for the fact that officers are often forced to make split-second decisions about what amount of force is necessary in circumstances that are tense, uncertain and rapidly evolving. 346 F.3d at 756.

Tolliver argues that the officers were not entitled to qualified immunity because (1) they created the danger by firing the first shot at a time when the car was stationary and he presented no threat to their safety; and (2) once the car started rolling towards the officers, it was moving so slowly that Tolliver did not present a threat of serious physical harm to the officers. As we have already noted, if the encounter unfolded as Tolliver asserts, with the officers firing the first shot as he sat stationary in the car, his version of events would necessarily imply the invalidity of his conviction for aggravated battery of Officer Sobieraj. That eliminates Tolliver's argument that the officers unjustifiably created the danger.

As for his claim that the car was moving so slowly that he did not place the officers in danger, the defendants point out that Officer Sobieraj was in fact injured as he tried to flee from

---

[5] (...continued)
could not hear the words because of the music playing in his car.

Tolliver's moving car. We will take that analysis a step further. "The fact-specific nature of whether an officer used excessive force depends on the totality of the circumstances surrounding the encounter." *Scott*, 346 F.3d at 756. "[A]n automobile may be used as a deadly weapon." *Scott*, 346 F.3d at 757. Considering the totality of the circumstances here, Tolliver asserts that his car was moving no more than three miles per hour at the time of the shooting. Three miles per hour is equivalent to 4.4 feet per second. In his deposition, Tolliver stated that when the officers pulled their car in front of his Mitsubishi to effect the stop, the police car was seven or eight feet in front of him (R. 33-1, at 53, 55), and that Sobieraj was eight feet in front of him when he exited the police car and pointed his gun at Tolliver (R. 33-1, at 55). Tolliver then backed up approximately one and a half car lengths (R. 33-1, at 51, 56, 57). Assuming that a car length is approximately sixteen feet, Tolliver backed up approximately twenty-four feet, putting a total distance of thirty-two feet (or approximately two car lengths) between his Mitsubishi and Officer Sobieraj. A car traveling only three miles an hour will traverse that distance in a little more than seven seconds.[6] Of course, when the car began moving in the direction of the officers, they had no way of knowing whether Tolliver would accelerate towards them, closing the distance even faster. They knew only that they had stopped a car being driven by a man purportedly transporting cocaine, and that the

---

[6] A car traveling three miles per hour would close the gap in 7.27 seconds. There are 5280 feet in a mile, and 3600 seconds in an hour. Three miles per hour is equivalent to 15840 feet per 3600 seconds, or 4.4 feet per second. To calculate the number of seconds it would take to close the gap, we divide 32 feet by 4.4 feet per second, and calculate 7.27 seconds.

man had responded by first backing up and then by moving towards them as they stood in front of the car. And as Tolliver alleges, as his car moved towards the officers, he fell to his right, under the steering wheel, and essentially disappeared from the officers' sight.

Qualified immunity applies to the actions of Officers Sobieraj and Debose here. Reasonable officers in their circumstances would have perceived the car as a deadly weapon that created a threat of serious physical harm. The Mitsubishi was only two car lengths from the officers when it began to move in their direction, and even at slow speeds, the officers had only seconds to react to the threat. Moreover, the officers had no way of knowing whether Tolliver would accelerate, shortening the space and time to react. By Tolliver's own account, the bullets were fired in rapid succession, over a period that could be measured in seconds. The officers stopped firing when the vehicle stopped moving and the threat had passed. During those few seconds, Sobieraj sprained his ankle as he moved away from the car.

Tolliver encourages us to split the time line into the moments before the car moved and the period after it began moving. In his opening brief, he claims that it was excessive force to shoot him before his car drove towards Sobieraj, and it was also excessive force to continue to shoot him when his car slowly moved towards Sobieraj. If the officers began shooting before the car moved, the defendants agree that qualified immunity would not apply but that scenario would necessarily imply the invalidity of Tolliver's conviction for aggravated battery. Because of *Heck*, Tolliver would have to obtain the reversal of his conviction before he could proceed

against the officers on that theory. And once the car began to move towards the officers, as a factual matter, there was no natural breaking point between the first few shots and the remaining shots. Even if it were possible to discern in those few seconds a meaningful break from the shots absolutely necessary to protect the officers and those that were unnecessary, the officers were entitled to qualified immunity because Tolliver had ducked out of sight, and the officers had no reason to know that he was disabled or that there was no need to continue firing. From a reasonable officer's perspective, the danger had not changed because the car continued to roll forward. In the totality of these circumstances, qualified immunity therefore applies to all of the officers' actions once the car began to move towards the officers.

As long as Tolliver's conviction stands, he is confined to a version of the facts that does not undermine the conviction. Because Tolliver's claim for excessive force fails under *Heck*, so too do his claims for conspiracy to conceal the use of excessive force and for indemnification.

AFFIRMED.