NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 4, 2020
Decided May 12, 2021

**Before**

FRANK H. EASTERBROOK, *Circuit Judge*

KENNETH F. RIPPLE, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

No. 19-3464

ESTATE OF ANDRE ALEXANDER
GREEN,
    *Plaintiff-Appellant*,

    *v.*

CITY OF INDIANAPOLIS, *et al.*,
    *Defendants-Appellees.*

Appeal from the United States District
Court for the Southern District of Indiana,
Indianapolis Division.

No. 1:17-cv-02673-JPH-TAP

James P. Hanlon,
*Judge*.

**O R D E R**

This is an excessive force case that arises out of a fatal police shooting. After excluding the plaintiff's forensic psychology expert, the district court entered summary judgment in favor of the defendants. On the limited record before the court, we affirm the judgment.

**I.**

At around 10 p.m. on August 9, 2015 in Indianapolis, decedent Andre Green, age 15, and another juvenile stole a red Nissan Altima automobile at gunpoint. One of the

two juveniles subsequently fired four shots from the car at a group of people who were standing at an intersection. Green was driving the stolen vehicle.

In response to a police dispatch, which included a description of the vehicle and its license plate, five marked police cars began tailing the Nissan, which Green was driving at a normal speed. Green ultimately turned onto a dead-end street, and police officers at that point activated their lights. As the vehicle approached the end of the street, the officers parked their cars six to eight feet apart in a tactical V formation behind the Nissan to block the street. (There was, however, an open field to the immediate west of the Nissan.)

Three things occurred as the Nissan reached the end of the street: the Nissan's passenger fled the vehicle on foot, Green turned the Nissan around, and Phillips exited her vehicle and voiced loud commands to Green to exit the vehicle and show his hands.

Officer Cory Heiny, one of the five officers at the scene, chased the fleeing juvenile on foot. Three other officers—Adam Mengerink, Vincent Stewart, and Marc Klonne—remained at the scene and, like Phillips, exited their vehicles, positioning themselves between their vehicles and the Nissan. All of the officers were aware that Green might be armed, given the reports that the Nissan was taken at gunpoint and that someone in the car had fired at a group of people.

On the Estate's understanding of the facts, Phillips' order that Green step out of the Nissan and raise his hands marked the initiation of a felony stop. It is undisputed that Green did not comply with Phillips' commands. He remained inside of the car, and drove it forward toward the parked police cruisers and the officers. As the district court noted, the parties dispute what happened next.

According to the defendant police officers, Green drove the Nissan into Phillips' car, then backed up, scraping the side of Heiny's car as he did so, revved the Nissan's engine, and accelerated forward a second time, this time toward the officers who were standing in front of the police vehicles.

The Estate posits that Green drove the Nissan into Phillips' car only once. On its view of the facts, Green scraped against Heiny's vehicle in the course of executing a multi-point turn. Once the vehicle was turned around, Green drove forward slowly in

an ill-fated effort to drive through or around the police cars now blocking his egress from the dead-end street.

As Green drove the Nissan forward toward the officers and police vehicles blocking his path, officers Mengerink, Stewart, and Klonne opened fire at Green through the windshield and front passenger window of the Nissan. The three officers would later testify that, at the moment they fired, they were unsure precisely where Phillips was and were concerned that if she were in her vehicle, she might be injured when Green struck it with the Nissan. One or more of the officers were additionally concerned that the Nissan might strike and injure themselves in addition to Phillips. As the firing commenced, the Nissan slowed, its wheels turned in the direction of Phillips' vehicle, and struck her vehicle near the driver's door.[1] A total of 20 shots were fired.

According to Stewart, Green opened the driver's side car door and stood up "like nothing had happened" but then collapsed face-first to the pavement. He had suffered five gunshot wounds. Two of the entrance wounds were on the back side of Green's body: one on the right side of Green's middle to lower back and one on his right lower leg. As described by the coroner's report, the bullet responsible for the former wound entered Green's back and traveled upward and forward, perforating the lower lobe of the right lung, entering the right ventricle of the heart and exiting the anterior left ventricle, and disrupting the coronary artery routes. The bullet then fractured the sternum and the left fifth rib and lodged within the anterior chest wall. The bullet that struck Green's lower leg fractured his mid-tibia and fibular bones.

After Green collapsed, one of the officers on the scene handcuffed his wrists, dragged his prone body away from the Nissan, and turned him over onto his back. At this point in time, a handgun was observed next to or underneath Green's body.

The record does not reveal precisely when Green died. We may assume as the Estate does that the bullet that transected Green's heart was fatal, although it is worth noting that the coroner's report itself does not go that far, instead listing multiple gunshot wounds as the cause of death. However, nowhere in the report does the coroner indicate how quickly Green's death would have ensued from the injury to his heart.

---

[1] The record does not reveal in what gear the car was left after it came to a halt.

Green's estate filed this section 1983 action against the City of Indianapolis and the three officers who shot at Green, contending that the officers had used excessive force and that the city was liable under *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 691 (1978).

Given that the three officers who fired at Green were shooting from the front and front passenger side of the vehicle, the Estate's theory was that the fatal shot, which entered through Green's back, must have been fired after Green emerged from the vehicle or while he was doing so. In support of that theory, the Estate relied in part on the coroner's report as to the location of the entry wound, but largely upon the report of William Harmening, a forensic psychology expert with 36 years of experience in law enforcement. Based on the evidence from the scene of the shooting, including the pattern of bullet cartridges, where the shards of shattered glass from the Nissan's windows fell, the location of the fatal wound on Green's back, and so forth, Harmening concluded that the Nissan had slow-rolled into Phillips' squad car; that many if not most of the shots—including the fatal shot—were fired after the Nissan came to rest; that the fatal shot that struck Green's heart likely killed him almost immediately; and (as just noted) that Green was getting out of the car or had left the car altogether when the fatal bullet struck him.

The district court granted summary judgment to the defendants. The court found that the Estate had disclosed Harmening's expert report 75 days after the deadline for expert disclosures and, in the absence of a showing that the belated disclosure was either justified or harmless, excluded the report from evidence. Based on the remaining evidence, the court found that the individual officers were entitled to qualified immunity on any claim that the discharge of their firearms in response to Green's actions amounted to excessive force. In the court's view, the officers were reasonably concerned for the safety of Phillips (and in at least one case, the other officers) as Green drove the Nissan forward toward the officers and Phillips' car. It was not clearly established that their decision to fire at Green in light of that concern was unreasonable. The court also found the evidence insufficient to support a *Monell* claim against the city.

## II.

The Estate challenges the district court's decision to exclude Harmening's report based on the Estate's failure to disclose Harmening and produce his report on a timely basis in compliance with the deadline established by the court for such disclosures. *See*

Fed. R. Civ. P. 26(a)(2). We review the district court's decision for abuse of discretion. *E.g.*, *Novak v. Bd. of Trustees of S. Ill. Univ.*, 777 F.3d 966, 972 (7th Cir. 2015). The Estate also contests the district court's decision, based on the remaining evidence before the court, to enter summary judgment in favor of the defendant police officers. We review that decision de novo. *E.g.*, *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 878 (7th Cir. 2021). As set forth below, the disclosure of Harmening as an expert was untimely, and the Estate did not carry its burden of demonstrating that the late disclosure was either justified or harmless. Without Harmening's expert analysis (and setting aside any question as to whether his key opinions were admissible), the Estate lacks sufficient evidence to support a finding that the shooting of Green amounted to unlawful excessive force. Based on the record before it, the district court properly entered summary judgment in favor of the defendant officers.[2]

A.      *Late disclosure of Harmening expert opinion*.

The initial case management plan that the parties themselves proposed and which the court adopted and entered in November 2017 provided that the "Plaintiff shall disclose the name, address, and vita of any expert witness, and shall serve the report required by Fed. R. Civ. P. 26(a)(2) on or before September 7, 2018," and that any proposed modifications of the deadlines set forth in the plan must be approved by the court. In June 2018, the parties jointly moved to extend the time to complete non-expert discovery and discovery relating to liability issues, and to file dispositive motions. The court granted that motion. However, the motion did not ask the court to extend the September 7, 2018 deadline for the plaintiff's disclosure of any expert witnesses and the production of their Rule 26 reports nor did the court's order do so.

On November 21, 2018, 75 days after the September 7 deadline for expert disclosure, the Estate disclosed Harmening as an expert witness and served his Rule 26 report on the defendants. This disclosure was made at or around the time the Estate filed its response to the officers' motion for summary judgment. Harmening had authored his report on June 16, 2018, and had submitted to the Estate that same day.

---

[2] The Estate does not pursue the *Monell* claim against the city on appeal, so we need not address that claim. And because we affirm the district court's holding as to qualified immunity, we need not address the defendants' alternative contention that the Estate's suit against them is untimely.

The officers moved for an extension of time to complete expert witness and damages discovery, noting that Harmening had been disclosed long after the deadline for expert disclosure and just 10 days prior to the cutoff for expert discovery. The district court granted the officers' motion, extending the deadline for completion of expert discovery to January 31, 2019, and also gave them until that date to file their reply brief in support of their motion for summary judgment. The extension afforded the defense the opportunity to depose Harmening. The court did not retroactively extend the September 7 deadline for disclosure of the Estate's expert.

The officers also asked the court to exclude Harmening's report from evidence. Consistent with a local rule and the terms of the case management plan, they incorporated their objection to the admission of Harmening's report into their reply brief in support of summary judgment.[3] They asserted that the Estate's late disclosure, particularly near the Thanksgiving and year-end holidays, had hampered their ability to locate witnesses to respond to Harmening's multiple opinions in the time available to them.

The Estate filed a perfunctory (two-page) surreply arguing that as a result of the prior extensions of non-expert discovery and the deadline for dispositive motions, the deadline for the disclosure of its expert was arguably extended implicitly to November 19, rendering their disclosure only two days late. The Estate also noted that the defendants had "filed several affidavits with their reply brief in an attempt to refute Harmening's opinions," but it made no effort beyond that brief observation to address the defendants' allegations of prejudice and to demonstrate that the accommodations the court had granted to the defense—including the extension of time to conduct expert discovery and depose Harmening—were sufficient to mitigate the belated disclosure of Harmening and his analysis of the evidence.

In accordance with the terms of Federal Rule of Civil Procedure 37(c)(1) and this circuit's precedents, when a party fails to timely disclose an expert witness and/or produce the report of his opinions as required by Rule 26(a), the exclusion of the

---

[3] Southern District of Indiana Local Rule 56-1(i) indicates that collateral motions (including motions to exclude evidence) are disfavored in summary judgment proceedings. The case management plan specified that a party wishing to exclude expert witness testimony at the summary judgment stage of the case should file its objections with its responsive brief.

witness's proposed testimony is automatic and mandatory, unless the proponent can show that the violation of Rule 26(a) was either justified or harmless. *E.g., Karum Holdings LLC v. Lowe's Cos.*, 895 F.3d 944, 951 (7th Cir. 2018).

The district court, as noted above, agreed that the Estate had not timely disclosed Harmening and produced his report. And because the Estate did not argue that it had cause for the late disclosure and did not fully engage with the defendants' arguments as to prejudice, the court excluded Harmening's expert opinion.

The district court did not abuse its discretion in excluding Harmening's opinion as untimely. The simple fact is that although the Estate had engaged Harmening and had his report in hand months before the September 7 disclosure deadline—which the court never extended—the Estate failed to name him and produce his Rule 26 report until 75 days past that deadline. The Estate suggests that the court improperly treated exclusion of Harmening's report as automatic and mandatory based solely on the lateness of disclosure. But the court used the language that the Estate highlights when noting (correctly) that it was the Estate's burden to demonstrate that the late disclosure was either substantially justified or harmless. Moreover, as the district court observed, the Estate neither justified the failure to timely produce the report nor meaningfully rebutted the defendants' assertions as to the prejudice resulting from the Estate's belated disclosure of Harmening. In the latter regard, the Estate merely noted that the defendants had produced some affidavits in an effort to refute Harmening's opinions, without demonstrating that the defendants were able to address all material aspects of Harmening's analysis. The court was therefore on solid ground in finding that the Estate had not met its burden to show that the report was admissible notwithstanding the late disclosure. *See Novak*, 777 F.3d at 972.

The Estate has suggested on appeal that the disclosure of Harmening should be treated as timely given that the district court had extended the deadlines for non-expert discovery and that, logically, whatever evidence was produced during that discovery would have informed the opinions of the parties' respective experts. But this argument was not made below, and for that reason it was waived.

B.     *Propriety of summary judgment as to the officers.*

As noted, the district court granted summary judgment in favor of the defendants on the basis of qualified immunity. A police officer is entitled to qualified immunity when his or her conduct does not violate a clearly established statutory or constitutional right of which a reasonable person would have known. *E.g.*, *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam). Where the plaintiff is alleging that an officer used excessive force in violation of the Fourth Amendment, whether or not the force was excessive will necessarily turn on the facts of the case. *See id.* at 1153 (quoting *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (per curiam)). Consequently, in an excessive force case, "police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue" and makes clear that the force employed by the officers was impermissible. *Id.* (quoting *Mullenix*, 577 U.S. at 13).

The district court in this case, looking to the Supreme Court's decisions in *Brosseau v. Haugen*, 543 U.S. 194 (2004) (per curiam), and *Plumhoff v. Rickard*, 572 U.S. 765 (2014), reasoned that it was not clearly established at the time of the shooting in 2015 that the degree of force the defendants used to stop Green amounted to constitutionally impermissible excessive force. *Brosseau* held that a police officer did not violate clearly established law as to the use of force when she fired at a fleeing vehicle in order to protect from potential harm other officers whom she believed to be on foot in the immediate area. 543 U.S. at 200–01. *Plumhoff* sustained as reasonable the use of deadly force against the driver of a vehicle who had led police on high-speed chase, collided with a police vehicle, come to a temporary standstill, and then attempted to maneuver his car so as to resume his flight. 572 U.S. at 776–77.  In the district court's view, it was reasonable for the officers to perceive that Green was using the Nissan as a weapon as he drove the car forward toward the officers and the police vehicles blocking his path. The court pointed out that all three of the defendant officers who fired at Green feared for Phillips' safety: Green was aiming his vehicle in the general direction of her cruiser, and the officers believed that she was either in that vehicle or might be standing somewhere nearby in harm's way. *See Tolliver v. City of Chicago*, 820 F.3d 237, 245–46 (7th Cir. 2016). All three also were aware that Green was one of two suspects in an armed carjacking after which shots had been fired. It was therefore reasonable for the defendant officers to conclude that the use of lethal force to stop Green's vehicle was appropriate in view of the danger that he posed to the officers and others.

The Estate does not quarrel on appeal with the rationale underlying the district court's qualified immunity determination—specifically, that it was not clearly unconstitutional for the officers to shoot at a fleeing driver whose maneuvering of the vehicle posed a danger to one or more of the officers themselves—but rather challenges the factual premise of the court's holding.  The Estate asserts that if one resolves all disputes and inconsistencies and draws all inferences in its favor, one may reasonably infer that the Nissan had come to a halt, and that Green was outside of the vehicle or emerging therefrom when he was struck with the fatal bullet. The Estate bases its assertion on both the path of the fatal bullet as described in the coroner's report and the damage that bullet did to Green's heart. If the car was no longer moving and Green was no longer behind the wheel, the Estate posits, he posed no danger to any of the officers and there was no need to employ lethal force against him.

Because Green is dead and we have only the officers' accounts of their fatal encounter with him, we must engage in a "fairly critical assessment" of the evidentiary record. *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994); *see also Estate of Escobedo v. Martin*, 702 F.3d 388, 409 (7th Cir. 2012); *Abdullahi v. City of Madison*, 423 F.3d 763, 772 n.7 (7th Cir. 2005). Nevertheless, the Estate as the party opposing summary judgment retains the burden of presenting evidence that creates a dispute of material fact for a finder of fact to resolve. *Estate of Escobedo*, 702 F.3d at 409.

We disagree with the Estate that, on the limited record before us, the factfinder could reasonably conclude that the Nissan had come to a stop and Green had already emerged from the car (or was in the process of doing so) when the fatal bullet struck him. The defendants themselves all testified to the contrary. They were present at the scene, observed the relevant events first-hand, and testified based on their personal knowledge. Their testimony, however self-serving it may have been, was affirmative evidence that Green was still inside of the Nissan, and was driving it toward the officers, when they shot at him.

The fact that the fatal bullet entered Green's back (as did the bullet that struck his lower leg) makes it a possibility that he was already out of the car, but it was only one possibility among several. Green might have remained inside the car but turned his body away from officers defensively as they began to shoot at him. He might have been preparing to exit the car and turning toward the car door for that purpose. Or the bullet

might have ricocheted within the car so as to strike him in the back.[4] These additional possibilities are consistent with the officers' testimony. Setting aside for a moment that testimony, which unequivocally places Green inside of the car, we can only speculate as to the likelihood of any of the various alternative possibilities, including the possibility that Green had already emerged or was emerging from the car. Expert testimony may not always be necessary to enable a factfinder to make an assessment as to the likely trajectory of a bullet, but this strikes us as the sort of case in which such testimony is essential to support the Estate's factual theory. *Cf. McGrath v. Tavares,* 757 F.3d 20, 26–27 (1st Cir.2014) (absent expert testimony as to trajectory of bullet, photographs of bullet holes in automobile were not enough to show where an officer was standing when he fired his gun). Without expert opinion on this subject, there would literally be no evidence to guide the jury in any direction in assessing the likelihood that Green was not inside the car, as the officers testified, but rather outside of the car, as the Estate presupposes, when the fatal bullet struck him. On the record as it stands, a jury could only do what we can, which is to speculate. As the Estate itself concedes, speculation is not a valid basis for a judgment in the Estate's favor or for defeating the officers' motion for summary judgment. *See Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010) (granting to party opposing summary judgment the benefit of all reasonable inferences does not extend to inferences that are supported only by speculation or conjecture); *Avery v. Mapco Gas Prods., Inc.*, 18 F.3d 448, 453–54 (7th Cir. 1994) (however theoretically possible plaintiffs' factual theory might be, "[they] must flesh out their theory with evidence; speculation will not do") (citation omitted).

Nor can we say that the damage done by the bullet that pierced Green's heart rules out the possibility that the bullet struck him while he was still in the car. The Estate presumes, based on the coroner's finding that the bullet transected Green's heart and disrupted coronary blood flow, that Green's death must have been virtually instantaneous and that it would have been impossible for him to open the car door and get to his feet, "as if nothing had happened," before collapsing, as Stewart testified. But this, again, is a subject on which expert testimony is required. We ourselves can only speculate on the record before us as to how quickly the injury to Green's heart would

---

[4] Although there apparently were no holes in the driver's seat back, that does not rule out the possibility that a bullet might have ricocheted within the vehicle and struck Green in the back without passing through the driver's seat. This would depend, obviously, on how Green's body was positioned when he was struck.

have disabled and killed him. Again, the coroner's report is silent as to how quickly death would have resulted.

The same is true with respect to the injuries to Green's lower leg, which the Estate likewise suggests would have made it impossible for Green to get out of the car and rise to his feet. Without medical testimony as to the likely effects of such injuries, we, like the factfinder, can only guess as to what Green could or could not have done.

In a further effort to call into doubt the officers' exculpatory recounting of the events, the Estate has flagged certain inconsistencies among the officers' accounts and between those accounts and certain other evidence in the record. None of the discrepancies, however, is sufficient to establish a dispute of fact material enough to preclude summary judgment.

The Estate has argued, for example, that the officers opened fire at Green within a few seconds of initiating a felony stop and that this casts doubt on their description of what Green did with the car to purportedly warrant the use of lethal force. As noted earlier, after the officers activated their lights and blocked the Nissan's escape path with their vehicles, Phillips initiated a felony stop as Green reached the end of the street and began to turn the car around. She ordered him to stop the car and get out. By the defendants' account, it was only after Green ignored the order, completed his turn, drove his car forward into Phillips car once, backed up, and began driving forward a second time, did the officers open fire. However, pointing to the audio recording of the police radio communications surrounding the incident, the Estate argues that as little as five seconds elapsed between a radio announcement that a felony stop had been initiated and a subsequent report of shots fired. The officers respond that the audio recording represents an edited compilation of the various radio reports (edited to delete extraneous communications concerning other incidents and to remove the silences between reports) rather than a historical record of the radio traffic as it occurred in real time. By contrast, a written history of events as reported to a control operator indicates that a minimum of 15 seconds elapsed between a report that the Nissan's passenger was fleeing (which took place close in time to the moment when Phillips initiated the felony stop) and the subsequent report of shots fired.[5] Our own review of the recording is consistent with the defendants' understanding: with few exceptions, each radio

_____

[5] Because we do not know how quickly events at the scene were reported to the control operator, we cannot know precisely when those events occurred in real time.

transmission is separated from the next by one to three seconds (itself suggesting editing to eliminate extraneous communications and silences, as the defendants have indicated); and among the last recorded transmissions are a police chaplain reporting that he was headed to a particular address to assist another chaplain and the same chaplain reporting less than 30 seconds later that he was departing that address and "headed home," confirming that the recording is not a reflection of how quickly these radio communications followed one another in real time. We are not convinced that there is a genuine discrepancy here that raises a doubt as to the accuracy of the officers' version of events.

The Estate also suggests that photographs of the damage to Phillips' squad car are inconsistent with the defendants' accounts that the Nissan struck her car forcefully when he drove it forward the first time (assuming he did so twice). The photographs reflect that the primary damage to Phillips' vehicle was to the driver's door, which was dislocated upward. To our mind, this does not rule out the possibility that officers' would have perceived the collision, as it occurred, to be a forceful one nonetheless. Even if we assume, as the Estate posits, that Green only drove forward toward the officers and their vehicles once rather than twice, the resulting damage to Phillips' car does not rule out the possibility that the Nissan was coming toward the officers in a manner that would have caused them to fear for their safety.

Finally, there indeed are certain inconsistencies among the officers' testimonies as to certain details: some officers testified that they saw the Nissan strike Phillips' car twice, whereas one officer said that he only saw it strike Phillips' vehicle a single time. At various times in the litigation, officers differed as to whether their primary concern, as Green drove the Nissan forward toward them, was for Phillips or one of the other officers in the Nissan's path. Officers also differed in their recollection of who it was who handcuffed Green and dragged him away from the Nissan after the shooting ended and he had collapsed to the ground. Inconsistencies of this sort are to be expected in the aftermath of events that unfolded quickly and ended violently and tragically. They do not, whether considered in isolation or collectively, support a reasonable inference that Green posed no danger to the officers and had in fact stopped and exited the car before he was shot dead.

**III.**

For the reasons we have set out above, the district court did not abuse its discretion in excluding the report of the Estate's expert. Nothing in the remaining

evidence presents a material dispute of fact precluding summary judgment and requiring a trial. In the absence of admissible expert testimony supporting the Estate's theory that Green was emerging from or outside of the car when he was fatally shot by the defendant police officers, a jury could only speculate that Green was exiting the car and no longer plausibly posed a danger to the officers.

AFFIRMED