Awok ANI–DENG, Plaintiff–Appellant,

v.

JEFFBOAT, LLC, Defendant–Appellee.

No. 14–2155.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 7, 2015.

Decided Jan. 27, 2015.

Dustin Tyrone White, Attorney, White Law Practice, Jeffersonville, IN, for Plaintiff–Appellant.

Edward H. Stopher, Attorney, Boehl, Stopher & Graves, Louisville, KY, for Defendant–Appellee.

Before WOOD, Chief Judge, and POSNER and EASTERBROOK, Circuit Judges.

POSNER, Circuit Judge.

The plaintiff filed a scattershot of discrimination and related claims against her former employer, Jeffboat (a division of American Commercial Lines), the nation's largest inland shipbuilder and second-largest manufacturer of barges. The district judge dismissed all the claims, some on the

pleadings and the rest on summary judgment.

A woman of Sudanese extraction, the plaintiff worked in Jeffboat's shipyard in Jeffersonville, Indiana as a welder from January 2006 until she was laid off in October 2011. She had been until late in her employment by Jeffboat a welder first class. Welders first class do the most difficult—and dangerous—welding jobs, such as overhead welding and welding in confined spaces. Welders second class do less demanding and safer welding jobs, and there are also welders third class, who do even less demanding jobs. In a two-week period in June 2011, the plaintiff, who had on 12 previous occasions sought first aid for work-related injuries, experienced two more such incidents, becoming dizzy and nauseous while welding in confined spaces. At the end of the month Jeffboat demoted her to welder third class. (According to the collective bargaining agreement between Jeffboat and the union that represented the plaintiff at the time the plaintiff, was demoted a welder first class received $21.10 per hour while a welder third class received $15.69 per hour.) The plaintiff claims that the company demoted her in retaliation for her having complained to the EEOC the previous February that the company was discriminating against her because of her sex and national origin.

She was laid off in October 2011, but the layoff was part of a general reduction in force based on seniority and in January 2012 the company notified her by certified mail that she was being recalled—she hadn't enough seniority to avoid the reduction but she had enough to be among the laid-off workers who were recalled. The letter stated that if she wanted to return to work she had to notify the company by 3:30 p.m. on a date in January that was five working days after the letter was mailed. She failed to reply within the deadline. However, on 6:00 p.m. on that fifth day her husband called the company to report that his wife did want to return to work. But the company had closed for business at 3:30, so he was able only to leave a voicemail.

Jeffboat is unionized and its collective bargaining agreement requires an employee, in order to secure his or her seniority, to "report for work within five (5) working days after being notified by certified letter to report." The plaintiff's husband phoned the company on the fifth day, but because the call was made after the close of business that day no one in the company received timely notice. The company informed the plaintiff that she'd missed the deadline and therefore would not be recalled; her employment with Jeffboat was over.

The plaintiff never received the certified recall letter that noted the deadline, but only because, as she admitted, she had failed to apprise the company that she had moved and that therefore her address was no longer the address in the company's records. The union's chief steward and an employee of Jeffboat's human resources department twice phoned her to remind her of the deadline (though no such attempt to remind is required by the collective bargaining agreement), but they were unable to reach her either time. The chief steward called a third time, now using his personal cell phone, but still failed to reach her. The chief steward then tracked down the plaintiff's husband, another Jeffboat employee, on the shipyard premises, and told him of the deadline, but as we said he failed to comply.

So far as appears, then, the plaintiff was demoted because of the company's safety concerns, which seem entirely legitimate given the dangerousness of the work and the incidence of safety violations, which

454

have included deaths, see OSHA Regulation News Release, Feb. 16, 2012, www.osha.gov/pls/oshaweb/owadisp.show_document?_table=NEWS_RELEASES&p_id=21831 (visited Jan. 26, 2015); she was laid off as part of a general reduction in force; and she would have been recalled if only she'd responded in time to the recall notice—and there is no valid reason she couldn't have responded in time. She seems to think that notice would have been timely had she or her husband left a voicemail message with Jeffboat at one second before midnight on the fifth day. But that's wrong because the company would not have received *meaningful* timely notice. Neither did it receive such notice when the plaintiff's husband left a voicemail message two and a half hours after the office that received the message had closed.

The only evidence of discrimination or retaliation against the plaintiff is an affidavit by Evelyn Miller, a former employee of Jeffboat who was still employed by the company when the plaintiff missed the recall deadline. In fact Miller was the other party to the abortive phone calls placed by the chief union steward. Miller's affidavit states that the company's labor relations manager "would regularly manipulate the workforce," "would review the seniority list for the different classes of jobs in order to find ways in which to terminate the employment of workers," and had "searched for a way to terminate the employment of" the plaintiff in stages, first by demoting her from welder first class to welder third class "for too many First Aid Visits," which Miller calls "unusual and not a real reason to demote a worker at Jeffboat," the "real reason" being the plaintiff's complaints "about how she was treated as a woman, as an African and as a non-English speaker by those who had supervision over her work." The affidavit goes on to state that many white and male welders

first class also went to First Aid because of overheating "yet, they experienced no demotion or reclassification," and that anyway the overheating was Jeffboat's fault for failing to provide enough fans. And finally the affidavit asserts that the plaintiff was "laid-off in violation of the CBA ... in retaliation to her complaint to the EEOC and other complaints."

The affidavit was entitled to no weight, as it had no foundation. "A [lay] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter," Fed.R.Evid. 602; *United States v. Joy*, 192 F.3d 761, 767 (7th Cir. 1999); *Visser v. Packer Engineering Associates, Inc.*, 924 F.2d 655, 659–60 (7th Cir. 1991) (en banc), though personal knowledge can include inferences, *id.; Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 849–50 (7th Cir.1992) (per curiam)—most of our personal knowledge is inferential. The affidavit itself could have contained the requisite evidence, since it is under oath. Had Miller's affidavit stated for example that she had overheard a company official say that he'd get the plaintiff fired because she was foreign, the affidavit, or at least that part of it, would have been admissible. But without such firsthand evidence in the affidavit itself—and there wasn't any—Miller needed discovery to establish the admissibility of the assertions in the affidavit. The plaintiff's lawyer inexcusably failed to conduct the necessary discovery. His discovery requests for pertinent company records missed the district court's discovery deadline. If it's true as Miller's affidavit states that the plaintiff's numerous "First Aid Visits" were attributable to the company's failure to provide enough fans, one would expect complaints to have been made by the welders to the union and by the union to

OSHA. Discovery would have revealed such complaints.

The statement in the affidavit that "too many First Aid Visits" are not a "real reason" why a welder is demoted is hardly credible, since a high accident rate would get Jeffboat into trouble with OSHA; but in any event the affidavit does not indicate how a human resources officer would know the "real reason" for demotion of a welder with injury problems. The affidavit fails also to indicate what basis the affiant had for thinking that white welders and male welders (white or black?) who made many First Aid Visits because of overheating were not punished by being demoted, or how the affiant learned that the company's labor relations manager was trying to fire the plaintiff in stages—did he tell the affiant that? Did she overhear him tell someone else? There is no evidence to suggest that Miller had personal knowledge of the manager's supposed scheming.

As for the charge that the plaintiff's supervisors mistreated her because of her sex, African origin, and language difficulties, Miller's affidavit should have named the alleged miscreants or at least provided some basis for identifying them. And contrary to another assertion in Miller's affidavit, it is apparent that the plaintiff does speak English, albeit not as well as a native English speaker. The chief union steward and Miller would have spoken to her in English had they reached her on the phone, and even her lawyer at oral argument acknowledged that she speaks "limited" English. Although her first deposition was conducted through an interpreter, confirming that she has difficulty with English, at her second deposition she appears to have understood most of the questions, which were in English, though at times she relied on an interpreter.

Without the affidavit, the plaintiff had nothing. The district judge was therefore on sound ground in dismissing her suit.

AFFIRMED.