In the

# United States Court of Appeals
### For the Seventh Circuit

_____

No. 22-1929

LATRONA RENEE MOORE, Administrator
of the Estate of Lamont Deshawn Moore,

*Plaintiff-Appellant,*

*v.*

WESTERN ILLINOIS CORRECTIONAL
CENTER, *et al.*,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:16-cv-03289-CSB — **Colin S. Bruce**, *Judge*.

_____

ARGUED SEPTEMBER 8, 2023 — DECIDED DECEMBER 20, 2023

_____

Before SYKES, *Chief Judge*, and ROVNER and KIRSCH, *Circuit Judges*.

ROVNER, *Circuit Judge*. When he was an inmate at Vandalia Correctional Center, Lamont Moore suffered a ghastly injury at the hands of a fellow prisoner, Kaleel Sample. Moore sued the guard on duty under 42 U.S.C. § 1983, for failing to protect him, and the prison to which he was subsequently sent for

violating his rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*. He also filed a conspiracy claim against the Vandalia officers who investigated the event that led to this injury, asserting that they conspired to falsify the official report in order to avoid liability for failing to protect him, instead blaming him for instigating the incident. Moore filed additional federal claims that are not part of the appeal, and also filed state law claims. The district court granted summary judgment in favor of the defendants on Moore's federal claims and relinquished jurisdiction over his state law claims. We affirm.

## I.

In June 2015, Moore was a prisoner at Vandalia Correctional Center, a minimum-security prison where inmates are housed in open-dorm settings. Moore's dorm housed approximately eighty-six inmates, including Sample. The dorm contained approximately forty-four bunkbeds lined up in four rows in a large room that was open like a large pole barn. Under the bunks were lockboxes for each inmate to store his personal property. Each inmate was issued a key to his lockbox. Moore's bunkbed was "a couple bunks down" from Sample's bunkbed. At the back of the dorm was a shower room and bathroom. A single guard sat at the front, overseeing the entire dorm. Jason Gatewood was the guard on duty during the day shift when Moore's injury occurred, and in the days leading up to the attack.

Approximately four days before the attack, Moore was in the dorm bathroom at the same time as Sample. Sample was "pouring water," "playing around and he was throwing and splashing water." Moore was brushing his teeth in a nearby stall as Sample did this, and Moore told Sample to stop

splashing water. A few days later, Moore complained about Sample to Gatewood and asked to be moved to another part of the dorm, away from Sample, but Gatewood did nothing.

On June 14, 2015, at approximately 10 a.m., shortly before lunch, Sample said something to Moore that Moore could not specifically recall later, but Moore "brushed it off and walked it off." Moore then asked Gatewood to move him to the other side of the dorm so that he could stay away from Sample and a "bunch of young guys" in the area where his bunk was located. According to Moore, he could not sleep in his assigned area because of the activities of the younger inmates. Gatewood declined to move his bunk assignment.

When Moore came back from lunch at approximately 11 a.m., he returned to his bunk and watched television with some of the other men located nearby. Around noon, Moore went back to Gatewood and asked again to be "move[d] off this side to get me away from these guys." Gatewood responded that he could not move Moore because he was not a lieutenant, and that he had conveyed Moore's request to a lieutenant.

Moore then went back to his bunk, where he sat with some of the other men for a few hours. At some point, Sample came into Moore's area and Moore asked him to leave. Sample and another inmate were engaged in "horseplay." They were "falling all over [the] bunks." Moore then went to the bathroom. When he returned to his bunk, Sample and the other man were still there, "tussling around" in Moore's area. They had moved some of the bunks. Moore again told them to leave, and Sample replied by "mouthing off." Moore then "went and hollered at the officer again," to no avail.

When Moore returned from talking to Gatewood, Sample said something else to him, and Moore again "brushed it off," and "walked off from it." Moore did not recall what Sample said because he was not paying attention to him. According to Moore, Sample then suddenly punched Moore in the face. Sample was aiming for Moore's neck, but Moore turned and took the blow in his left eye. Sample had the key to his lockbox intertwined in his fingers, and the key pierced Moore's eyeball. When Sample pulled back from the punch, Moore's eyeball came out of its socket with the key. By this time, the 3 p.m. shift change had begun, and Gatewood was no longer present. Fellow prisoners immediately alerted the officer on duty, who notified the healthcare unit. Within minutes, Moore was rushed to the healthcare unit in a wheelchair and then sent to the emergency room of an outside hospital. He was in the hospital for a few days. A doctor there pushed the eyeball back into the socket and treated Moore for his injuries. Moore returned to the healthcare unit at Vandalia where he continued to receive treatment for his injuries. On July 15, 2015, Moore was transferred to the healthcare unit at Western Illinois Correctional Center.

After spending two weeks in the healthcare unit at Western Illinois, Moore was placed in the general population against his wishes. He expressed that he felt safer in the healthcare unit than in the general population where he might be attacked again. Moore was never able to see from his left eye again. Moore's doctor recommended removing the damaged left eye in order to preserve the vision in his right eye. In September 2015, Moore was moved to a hospital in Springfield, Illinois for the operation and was then returned to the healthcare unit at Western Illinois. After a week in the healthcare unit, Moore was sent to the general population

again. He was placed in a part of the prison that was a great distance from the healthcare unit, where he needed to walk each day for continued care. With monocular vision, Moore had balance problems, blurry vision in his remaining eye, and no depth perception. Although he had no problems with "physically walking," these conditions nevertheless made walking difficult and slow. He was issued a low bunk permit and a slow walk permit. It took him thirty to forty minutes to get to the healthcare unit from the unit where he was housed. Asked whether other inmates helped him, he answered, "Yeah, a couple sometimes." R. 55-1, at 40. Moore took medication three times a day. Prison staff brought his medication to him in the morning and the evening, but once a day, he had to walk to the healthcare unit for medication and to get his bandage changed. During lockdowns, prison staff came to Moore's housing unit three times a day to deliver medication and change his bandage. The chow hall was approximately five minutes from the healthcare unit and when the prison was not on lockdown, Moore generally went from his healthcare visit directly to lunch. He asked a few officers, a lieutenant, someone in internal affairs, a nurse, a doctor, and his counselor to be placed closer to the healthcare unit but was not moved closer until shortly before he was transferred out of Western Illinois to Graham Correctional Center. Although he walked slowly, Moore never fell while he was at Western Illinois and never injured himself there. He was able to get to all the places he wanted and needed to go, including the healthcare unit, the chow hall, the visitor's center, the commissary, the yard, and the school building.

At Graham, he was forced to walk long distances to get to the healthcare unit three times every day. The trip took twenty to thirty minutes. Nevertheless, Moore was able to get

everywhere he needed to go at Graham including the healthcare unit, the chow hall, the commissary, a special gym for persons with disabilities, and the yard. At Graham, Moore was given eyeglasses to help with the blurry vision in his remaining eye. As was the case at the other facilities, he had a low bunk permit and a slow walk permit at Graham. While at Graham, Moore asked an officer, a lieutenant, and a doctor to be moved closer to the healthcare unit. No one ever responded to his requests. Moore suffered no injuries at Graham.

Moore testified at his deposition that he was not expecting Sample's attack and he was not afraid of Sample. When asked if Sample ever said anything to him that made him think that Sample would attack him, Moore replied, "No. If he did, I would have—this wouldn't have happened. I didn't see it coming." R. 55-1 at 20 (Moore Deposition). Moore said that he spoke to Gatewood about Sample approximately five times before the attack. Asked what he said to Gatewood, he responded:

> I asked him could he move me—move me from out over here by these guys. Could you move me over where these guys are at because they horseplay and they playing too much. Bunch of young kids. They young. Bunch of young kids. I was trying to get away from the situation. They was wrestling, throwing water all on people's bunks. So I was trying to get moved before any of this occurred to me. Trying to get off of this side. They told me they not going to move me so I went back in there. Then he say he going to holler at the lieutenant because I kept

> constantly nagging him about it. And I had my
> wife to call down there to the penitentiary and
> tell them that I'm constantly trying to get away
> from this situation.

R. 55-1, at 91–92.

Moore filed this lawsuit in 2016 claiming, among other things, that Gatewood failed to protect him, and that the Illinois Department of Corrections and officials at Western Illinois Correctional Center violated his rights under the Americans with Disabilities Act. He was released from custody in 2017. As we noted earlier, the district court granted summary judgment in favor of the defendants on all of Moore's federal claims and relinquished jurisdiction over his state law claims. Moore died in 2022. This court granted a Motion for Substitution of Party Pursuant to Federal Rule of Appellate Procedure 43(a)(2), and substituted Moore's wife, Latrona Renee Moore, as the plaintiff-appellant.

## II.

On appeal, Latrona Moore challenges the district court's view of the evidence. In particular, she asserts that, in concluding that Gatewood was not aware of the risk of harm to Moore, the district court failed to view the evidence in the light most favorable to Moore and failed to draw all reasonable inferences in his favor. She also asserts that the court erred in finding that Moore's loss of one eye did not substantially limit his ability to walk.

We review the district court's grant of summary judgment *de novo*, examining the record in the light most favorable to the nonmovant and construing all reasonable inferences from the evidence in his favor. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 255 (1986); *Tolliver v. City of Chicago*, 820 F.3d 237, 241 (7th Cir. 2016). Summary judgment is appropriate when there are no genuine disputes of material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Tolliver*, 820 F.3d at 241.

A prisoner's claim for failure to protect is analyzed in the same manner as other conditions-of-confinement claims under the Eighth Amendment. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991). Prison officials "are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves." *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984). That includes a duty to protect prisoners from violence at the hands of other prisoners. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

> It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety. Our cases have held that a prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, "sufficiently serious[;]" … a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities[.]" … For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. … The second requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." … To violate the Cruel and

Unusual Punishments Clause, a prison official must have a "sufficiently culpable state of mind." … In prison-conditions cases that state of mind is one of "deliberate indifference" to inmate health or safety[.]

*Farmer*, 511 U.S. at 834 (internal citations omitted).

Under the well-established standard in *Farmer*, in order to hold Gatewood liable for failing to protect Moore, Latrona Moore must demonstrate that Gatewood knew of and disregarded an excessive risk to inmate health or safety. She must show that Gatewood was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and he must also have drawn the inference. *Farmer*, 511 U.S. at 837. In failure-to-protect cases, plaintiffs normally prove actual knowledge of impending harm by showing that they complained to prison officials about specific threats to their safety. *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015). "Complaints that convey only a generalized, vague, or stale concern about one's safety typically will not support an inference that a prison official had actual knowledge that the prisoner was in danger." *Gevas*, 798 F.3d at 480–81.

The plaintiff's evidence here is not sufficient to defeat summary judgment on the issue of Gatewood's state of mind as articulated in *Farmer*. Moore's own testimony demonstrates that his complaints to Gatewood regarding Sample indicated little more than annoyance over Sample making noise, splashing people and bunks, and "horseplay." In none of his testimony did Moore indicate that he conveyed to Gatewood a fear for his safety or facts from which Gatewood could infer that there was a substantial risk of serious harm. Indeed,

Moore testified that he was not afraid of Sample, that Sample said and did nothing to indicate that he posed a danger to Moore, and that Moore himself did not see the attack coming. If Moore could not predict the attack, it would be difficult to see how Gatewood could have anticipated it. *See Dale v. Poston,* 548 F.3d 563, 569 (7th Cir. 2008) (plaintiff's vague statements that inmates were "pressuring him" and "asking questions" were inadequate to alert the officers that there was a true threat at play); *Grieveson v. Anderson*, 538 F.3d 763, 776–77 (7th Cir. 2008) (plaintiff's statements that he was afraid and wanted to be moved without also conveying that he was perceived as a snitch by fellow prisoners was too vague to put officers on notice of a specific threat to plaintiff's safety).

The plaintiff's additional evidence is also insufficient to defeat summary judgment. Latrona Moore points to Gatewood's knowledge that Sample had a disciplinary record. But prior to this attack, Gatewood knew only about Sample's non-violent disciplinary history: Sample had been cited for insolence. Prior to the attack, Sample's behavior toward Moore was perfectly consistent with his reputation for insolence and "mouthing off," not for engaging in physical violence.

Latrona Moore also cites the affidavit of Xavier Brownlee, Moore's fellow inmate who averred that, on the day of the attack, he "witnessed an altercation between Lamont Moore and Kaleel Sample." Brownlee also said that, on that same day, he witnessed Moore telling Gatewood that "he was concerned about his physical safety after the altercation with Kaleel Sample." R. 63-4. The district court found the second part of Brownlee's statement (where he repeated what he overheard Moore say to Gatewood) to be inadmissible hearsay. The case that Latrona Moore cites in answer to the district

court's hearsay finding is easily distinguishable. She relies on
*Ani-Deng v. Jeffboat, LLC*, 777 F.3d 452 (7th Cir. 2015), for the
proposition that courts may consider "first-hand" evidence in
an affidavit. The affidavit in that employment discrimination
case had been excluded because the affiant lacked personal
knowledge of the contents of her statement. We noted that,
had the "affidavit stated for example that she had overheard
a company official say that he'd get the plaintiff fired because
she was foreign, the affidavit, or at least that part of it, would
have been admissible." 777 F.3d at 454. In that instance, the
affiant would have had personal knowledge as the person
who heard the statement of a company official, and the con-
tent of the company official's statement would itself be admis-
sible as an admission of a party opponent. Fed. R. Evid.
801(d)(2). Although Brownlee had personal knowledge of
Moore's statement because he heard Moore utter it, Moore's
statement does not fall within the party opponent exclusion
from the hearsay rule. As that is the only argument that
Latrona Moore makes regarding the hearsay finding for
Brownlee's statement, we find no abuse of discretion in the
court's ruling. *McCottrell v. White*, 933 F.3d 651, 656 n.3 (7th
Cir. 2019) (although we review the grant of summary judg-
ment *de novo*, we review the court's ruling on the hearsay is-
sue for abuse of discretion).

The second problem with Brownlee's affidavit is that it is
directly contradicted by Moore's own sworn testimony. We
have recounted everything that Moore said in his deposition
regarding his statements to Gatewood about Sample. In none
of those statements did Moore indicate that he was concerned
for his safety. In fact, Moore affirmatively denied that he
feared Sample or had any reason to fear Sample. We suppose
that Brownlee could nevertheless have heard Moore tell

Gatewood that he feared for his physical safety. But allowing Brownlee's recitation of Moore's out-of-court statement to Gatewood would accomplish something that Moore himself could not do, which is to directly contradict his own sworn deposition testimony as to what he told Gatewood. More to the point, it would allow into evidence a statement to Gatewood which was untruthful, because in his deposition, Moore had unequivocally denied that he had any reason to believe that Sample posed a danger to him.

The third problem with Brownlee's retelling of Moore's statement to Gatewood is that this is the sort of vague statement that our cases deem insufficient to have put the officer on notice of a real threat to Moore's safety. Brownlee does not describe the nature of the "altercation" between Moore and Sample; nor does he state why Moore had this fear, and the statement that he purports to have heard from Moore to Gatewood does not answer these questions. But Moore's sworn testimony fills in the gaps: Moore made clear in his testimony that it was a verbal dispute regarding horseplay, and that Sample never said or did anything to cause Moore to think that Sample would attack him. Based on Moore's own sworn statements regarding his conversations with Gatewood, at most, Brownlee heard Moore relating a (false) fear for his physical safety based on an argument over horseplay that involved no threats of physical violence. That is not sufficient to put the officer on notice of a substantial risk of serious harm. *See Klebanowski v. Sheahan*, 540 F.3d 633, 639–40 (7th Cir. 2008) (where officers knew only that plaintiff had been involved in an altercation with three other inmates, and that he wanted a transfer because he feared for his life but he did not tell them that he had actually been threatened with future violence, nor that a prior attack was inflicted by gang members because of

his non-gang status, there was nothing leading the officers to believe that the plaintiff himself was not speculating regarding the threat he faced out of fear based on the first attack he suffered).

Latrona Moore also cites her affidavit, where she recounted what Moore told her in telephone calls regarding his conversations with Sample and Gatewood. She similarly relies on statements that Moore made in grievances that he filed in prison after the incident. The district court refused to credit any of this evidence, finding that Latrona lacked personal knowledge of the matters averred and that the affidavit recounted inadmissible hearsay. The court was correct. Latrona Moore had no personal knowledge of conversations between Moore and Sample, or Moore and Gatewood, and so her affidavit was inadmissible on these matters. Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). And Moore's out of court statements to Latrona are inadmissible for the truth of the matter asserted. Fed. R. Evid. 801(c). Even if her affidavit was not based on hearsay and matters outside her personal knowledge, nothing that Moore relayed to Latrona indicated that Moore alerted Gatewood to a substantial risk of serious harm.

In the grievances, Moore claimed that he witnessed Sample attempting to break into his property box, that he confronted Sample, and that an argument ensued. Moore asserted that he reported this incident to Gatewood, and told Gatewood that there was "trouble brewing," and that, if he was not separated from Sample, "an altercation would

ensue." R. 63-9, 63-10, 63-11. Moore's out-of-court statements in the grievances are both inadmissible for the truth of the matter asserted, and also insufficient under our cases to alert the officer that Sample posed a substantial risk of serious harm to Moore.

In the end, there is no admissible evidence that Moore ever made Gatewood aware of a substantial risk of serious harm. That dooms the failure-to-protect claim. And because the failure-to-protect claim fails, the district court was also correct to grant summary judgment in favor of the defendants on his federal conspiracy claim. "Without a viable federal constitutional claim, the conspiracy claim under § 1983 necessarily fails; there is no independent cause of action for § 1983 conspiracy." *Katz-Crank v. Haskett*, 843 F.3d 641, 650 (7th Cir. 2016) (citing *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000)).

That brings us to Moore's ADA claim for discrimination and failure to accommodate, against Western Illinois and the Illinois Department of Corrections, seeking both injunctive relief and monetary damages. As Moore is no longer in prison, and in fact is no longer alive, there is no effective injunctive relief that any court could grant him at this stage, and Latrona Moore does not challenge the defendants' argument to that effect. Only the claim for monetary damages remains on appeal.

Moore's claim arises under Title II of the ADA, which prohibits disability-based discrimination in the provision of public services, programs, and activities. *Lacy v. Cook County, Illinois*, 897 F.3d 847, 852 (7th Cir. 2018); 42 U.S.C. § 12132. To make out a claim for discrimination under Title II of the ADA, a plaintiff must demonstrate that: (1) he is a qualified

individual with a disability; (2) he was denied the benefits of the services, programs, or activities of a public entity, or otherwise subjected to discrimination by such an entity; and (3) the denial or discrimination was by reason of his disability. *Lacy*, 897 F.3d at 853. "Disability" is a defined term in the ADA:

> The term "disability" means, with respect to an individual—
>
> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such an impairment; or
>
> (C) being regarded as having such an impairment (as described in paragraph (3)).

42 U.S.C. § 12102(1).

In Moore's case, we are concerned only with the first part of this definition, whether he had a (1) physical impairment (2) that substantially limited (3) one or more major life activities. Moore certainly had a physical impairment: he lost his left eye, and his vision was thereafter monocular. 29 C.F.R. § 1630.2(h) ("Physical or mental impairment means— (1) Any … anatomical loss affecting one or more body systems, such as … special sense organs[.]"). Moore asserted that this condition substantially limited his ability to walk. Walking is considered a "major life activity" under both the statute and the regulations. 42 U.S.C § 12102(2)(A); 29 C.F.R. § 1630.2(i)(1)(i). There is therefore sufficient evidence to proceed past summary judgment on the first and third parts of the disability analysis.

The district court found that Moore's ADA claim failed on the second part: whether the impairment *substantially limited* his ability to walk. But in reaching that conclusion, the court relied on case law and regulations that predated significant amendments to the ADA. *See* ADA Amendments Act of 2008, Pub.L.No. 110-325, 122 Stat. 3553 (2008). New regulations clarify that, "The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i). In fact, "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). Even before those amended provisions broadened ADA coverage, the Supreme Court noted that people with monocular vision "ordinarily" will meet the Act's definition of disability in the major life activity of seeing. *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999). Under the new standard, whether Moore's monocular status rendered him disabled in the major life activity of walking is therefore a close question on summary judgment, but we need not address it to decide the appeal.

We may affirm summary judgment on any basis we find in the record. *Nature Conservancy v. Wilder Corp. of Delaware*, 656 F.3d 646, 653 (7th Cir. 2011). The defendants argued in the alternative that Moore failed to demonstrate that any disability-based discrimination was intentional. To recover damages in a Title II action, a plaintiff must identify intentional conduct (and not mere negligence) by a named defendant. *Shaw v. Kemper*, 52 F.4th 331, 334 (7th Cir. 2022); *Lacy*, 897 F.3d at 862. "[A] plaintiff can establish intentional discrimination in a Title II damage action by showing deliberate indifference."

*Lacy*, 897 F.3d at 863. We have adopted a two-part standard for deliberate indifference in this context; it requires both (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood. *Lacy*, 897 F.3d at 863. "In other words, a plaintiff must prove indifference that is a deliberate choice by defendants." *Lange v. City of Oconto*, 28 F.4th 825, 841 (7th Cir. 2022).

Latrona Moore did not respond to this argument on appeal. Our review of the record demonstrates that there is no evidence from which a jury could infer that any defendant knew that harm to a federally protected right was substantially likely. Although Moore complained to numerous people about the distance to the healthcare unit, he never alerted anyone at any prison that he required an accommodation in order to access services. In fact, he never followed any of the prisons' prescribed policies for alerting the correct individuals of his need for an accommodation. He argued in the district court that he alerted prison officials to his needs in three grievances that he filed after the attack. But nothing in any of the grievances alerted prison officials to a need for an accommodation. Moore did not check the box for "ADA Disability Accommodation" on any of the grievances; nor did he list in "relief requested" that he wished to be moved closer to the healthcare unit. He never mentioned in the grievances any problems with distance or the need to be closer to the healthcare unit or any other destination. Instead, his grievances were directed at the staff's failure to protect him from Sample, complaints about medical treatment, and his dissatisfaction with receiving a disciplinary report. Although he mentioned the loss of his eye, he did not indicate in any grievance or through any other authorized prison procedure that he required an accommodation in order to access services.

The record as it relates to accommodations demonstrates that prison officials gave Moore a permit that allowed him to walk more slowly than other prisoners, an eye patch, glasses, and extensive medical care. Moore conceded that he was able to get everywhere he wanted or needed to go in prison, albeit more slowly. He was able to access every service (which we define to include programs and activities, for the sake of brevity) that he wanted in prison including the healthcare unit, the chow hall, the visitor center, the commissary, the yard, and a special gym, among other places. Moreover, there is no evidence in the record that any defendant knew that he could not access any services. Nor has he produced any evidence that any defendant made a deliberate choice to deny him access to services. Without any evidence supporting a finding of deliberate indifference, his claim for damages fails.

We therefore affirm the grant of summary judgment in favor of the defendants on this claim. Finally, having resolved all of the federal claims, the court was well within its discretion to decline to exercise supplemental jurisdiction over the state law claims. *Tobey v. Chibucos*, 890 F.3d 634, 652 (7th Cir. 2018) (generally, we review for abuse of discretion a district court's decision not to exercise supplemental jurisdiction over a plaintiff's state-law claims).

AFFIRMED.