In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 22-2211

ALEIA TOUSIS, As Special Administrator
of the Estate of Gus Tousis, deceased,

*Plaintiff-Appellee,*

*v.*

KEITH BILLIOT, Special Agent, Drug
Enforcement Administration,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:20-cv-03012 — **Sharon Johnson Coleman**, *Judge.*

_____

ARGUED JANUARY 5, 2023 — DECIDED OCTOBER 18, 2023

_____

Before FLAUM, ROVNER, and BRENNAN, *Circuit Judges.*

ROVNER, *Circuit Judge.* Aleia Tousis, as special administrator of the estate of her father, Gus Tousis, sued a law enforcement officer who shot and killed Gus Tousis following a high-speed chase. The officer moved for summary judgment on qualified immunity grounds, and the district court denied the motion. We reverse.

**I.**

Because this appeal arises from the denial of the officer's motion for summary judgment, we view the facts in the light most favorable to the nonmoving party, the daughter of the driver involved in this incident. *Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014). We may not make credibility determinations or weigh the evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). We will refer to Gus Tousis as "Tousis" and to his daughter as Aleia.

The Drug Enforcement Administration ("DEA") began investigating Tousis in late 2017. Based on that investigation, the DEA obtained a warrant to place a tracking device on Tousis's car. In addition to providing investigators with the location of Tousis's car, the device tracked the speed at which the vehicle was traveling. On June 2, 2018, the investigating agents believed that Tousis was involved in drug trafficking, that he had a source named Vernon Turner in the Aurora, Illinois area, and that he would be going to Turner's home that day to procure drugs. They decided to surveil Turner's home, observe whether Tousis procured illegal drugs, and then arrest Tousis and seize any drugs that he obtained from Turner.

On the day in question, DEA Task Force Officer Robert Boehnke surveilled Turner's home and observed Tousis arriving in a gray or silver SUV. Boehnke saw Tousis enter Turner's garage carrying a bag, and then exit the garage carrying the same bag. Boehnke noted a change in the appearance of the bag and believed that a drug transaction had taken place. He informed his fellow officers about what he saw. Special Agent Keith Billiot, the defendant here, was a supervisory special agent involved in the investigation that day. He

understood that Tousis was suspected of dealing cocaine and heroin, and that he had a record of drug-related arrests as well as arrests for other offenses. Agent Billiot followed the reports from Officer Boehnke and other DEA agents that day.

DEA agents enlisted the aid of the DuPage County Sheriff's Department to conduct a traffic stop of Tousis's SUV after it left Turner's home. When a sheriff's deputy attempted the stop near I-88 and Yackley Avenue, Tousis fled at high speeds, with the tracking device showing that the car accelerated from 64.6 miles per hour to 115.2 miles per hour on I-88 during the chase. Because of the danger to the officers and the public posed by Tousis's reckless flight, the officers ended their pursuit. Tousis was last observed by those officers weaving in and out of traffic at dangerous speeds. The tracking device continued to show Tousis's location and speed, and the officers, including Agent Billiot, followed his progress. After the officers ended the visible pursuit on I-88, Tousis reduced his speed at certain points. The officers hoped to follow Tousis to his home or to some place where it would be safe to apprehend him. Billiot learned from his fellow officers that Tousis was heading eastbound on Interstate 290 at a high rate of speed. Agent Billiot was driving an unmarked car that was equipped with a siren and emergency lights. He proceeded to Interstate 290 and spotted Tousis but did not activate his lights or siren. Billiot followed Tousis off the highway at Central Avenue in Chicago, where Tousis proceeded southbound. At this point, Tousis was driving at normal speeds, but he was taking evasive actions that indicated to Billiot that Tousis suspected he was being followed.

Billiot continued to follow Tousis until they were both headed northbound on Central Avenue. At that point in the

road, Central Avenue has two lanes in each direction with a median separating them. Tousis was in the left-hand lane and Billiot in the right-hand lane when Billiot observed that Tousis was approaching a red light and would be stopped behind two cars at the light. Billiot decided that this was a good place to make a second attempt at a traffic stop because Tousis would be blocked in by traffic and would be unable to flee. Billiot activated his emergency lights and siren and pulled in front of Tousis's car at a northwest angle. The position of Billiot's car in relation to Tousis's car placed the driver's door of Billiot's car directly in front of Tousis's car at a distance of approximately ten to twenty-five feet. Officer Boehnke was approaching from behind and was over a hundred yards away from the scene of the confrontation at the moment that Billiot pulled in front of Tousis. After stopping his car, Billiot grabbed his carbine rifle, exited his car wearing a well-marked DEA law enforcement vest and ran towards Tousis's stationary car, shouting commands at him to turn off the car and exit the vehicle. Closing the distance between the cars as he ran, Billiot raised his rifle and pointed it at Tousis, but Tousis ignored Billiot's orders. Instead, Tousis moved the car forward, maneuvering to the right where the lane was now open. There was nothing between Agent Billiot and Tousis's car. As soon as Tousis's car pulled forward, Billiot fired a single shot at Tousis with his rifle. Backpedaling from the moving car, Billiot fell onto the median, injuring his back. The bullet struck the steering wheel "off-center to the left from the top of the steering wheel," and a fragment hit Tousis in the neck. R. 62-2, at 21, ¶ 56. When comparing the location of the bullet hole in the windshield with the location of the bullet strike on the steering wheel, the positioning indicates that, at the moment that Billiot fired his weapon, "Tousis was turning his wheel

to the right, maneuvering his vehicle away from Billiot, and Billiot was angled to the driver['s] side of the front end of Tousis's vehicle." *Id*.

After the shot was fired, Tousis's car accelerated, veering to the right. The car struck a light pole, jumped a curb, and came to a stop. The car was moving fast enough that, when it hit the light pole, the front right wheel was torn off and the axle was broken. Officer Boehnke pulled up and saw that Tousis was slumped down and bleeding from the neck. Both Boehnke and Billiot tried to open the car, but the doors were locked and their efforts to break the windows with a hand strike, with a device called a "window break," and with a baton were all unsuccessful. Eventually, Tousis was extracted from the car with the aid of an Illinois Department of Transportation worker who broke a window with a sledgehammer. Tousis was taken to a hospital where he was pronounced dead. Billiot was also taken to a hospital where he was treated for injuries to his back and released the same day. The police officers recovered approximately 300 grams of cocaine from Tousis's car.

Before we move on to the legal analysis, we note that there were several factual disputes between the parties in the summary judgment briefing below but none are material. In particular, Aleia asserted that summary judgment was inappropriate because of disputes regarding the timing of the shooting, the distance between Billiot and Tousis at the moment the shot was fired, whether Billiot was struck by Tousis's car during the incident, and the positioning of Billiot relative to Tousis's car. But certain concessions made in the district court by both parties clarify that the disputes to which Aleia refers are not material to the relevant legal question.

As will become clear below, the most important fact for the legal analysis of the claim of qualified immunity is whether Tousis's car was in forward motion in the vanishingly small space between that car and Agent Billiot at the moment Billiot fired the rifle. Aleia asserts that Tousis was not driving directly toward Billiot at the moment the shot was fired but was "maneuvering" to the right in an attempt to flee. Billiot accepts that Tousis's tires were turned to the right as the car began to move forward. Although Aleia attempts to manufacture a fact dispute regarding whether the car moved forward at all before Billiot fired the shot, all of the evidence in the record, including concessions by Aleia in summary judgment proceedings in the district court, demonstrates that the vehicle was in forward motion, albeit with the wheels turned to the right, before Billiot fired the shot. In particular, Aleia conceded below that "as soon as Tousis's vehicle pulled forward, Billiot fired his weapon." R. 62-2, at 19, ¶ 53. Both Agent Billiot and Officer Boehnke testified that Billiot fired the shot after Tousis's vehicle began to move forward. R. 59, Ex. A, at 123 (Billiot Dep. at 106); R. 59, Ex. B, at 149 (Boehnke Dep. at 42–44). Moreover, a disinterested bystander who was standing at a nearby exit ramp also reported to the police that he saw an officer position himself in front of a car, that the vehicle began to move in the direction of the officer, that he heard a gunshot and saw the officer fall to the ground. R. 59, Ex. O, at 234 (Supplementary Police Report, at 3). Even without this additional evidence, Aleia's concession alone establishes that the vehicle was in motion prior to the shot being fired.

Aleia nevertheless cites a Supplemental Police Report ("Report") that summarized an interview of Officer Boehnke as evidence that Tousis did not drive forward until after

Billiot fired the shot, suggesting that his forward motion at that point was not the result of any intentional action on Tousis's part. The summary of Boehnke's interview in the Report states that he was approaching the area where Tousis's car had been spotted and saw that it was stopped at a northbound traffic signal. In that summary, Boehnke described hearing the gunshot and then seeing Billiot fall to the ground. He then saw Tousis's car accelerate to the right and hit the light pole before coming to rest. R. 59, Ex. F, at 187. Aleia reads this interview summary as an admission that the car was not in motion before the shot was fired. But the Report's silence on whether the car was in motion before the shot was fired is not evidence that the car was stopped. It would be pure speculation to fill in the gap in the Report with such an assumption. *Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021) (a court need not give credence to facts based on speculation or conjecture); *Eaton v. J.H. Findorff & Sons, Inc.*, 1 F.4th 508, 513 (7th Cir. 2021) (speculation is not enough to create a genuine issue of fact for the purposes of summary judgment). At his deposition, Boehnke was asked specifically about the movement of Tousis's car before the shot was fired. Boehnke explained that he was driving down a hill toward the scene and saw Tousis pull forward, then heard the gunshot, and then saw Billiot fall to the ground. He then saw Tousis's car shoot off to the right where it hit a light pole, jumped a curb and came to rest. None of this testimony was inconsistent with the Report; it simply supplemented the Report on an issue not raised in the Report. The undisputed evidence demonstrates that Billiot fired the shot after Tousis's car began to move forward.

Aleia also argues that the distance between Billiot and Tousis's car at the moment of the shot is in dispute. But Aleia also conceded below that Billiot stopped his car between ten

and twenty-five feet in front of Tousis's car, and then ran toward Tousis's vehicle as fast as he could, shortening the distance between them. R. 62-2, at 20, ¶ 53. By any account, that would mean that Billiot stood much less than twenty-five feet from the front of Tousis's car, or fewer than two car lengths. As for the positioning of Billiot in front of Tousis's car, Billiot has accepted for summary judgment purposes that the angle at the time of the shot indicated that the wheels of the car were turning rightward at the moment of the shot, toward the lane of traffic that was then open. Aleia also denies Billiot's claim that the car backed up before it pulled forward and urges us to reject Billiot's claim that he was hit by Tousis's car as he backed away. But Billiot accepts for summary judgment purposes that Tousis did not back up before moving forward, and that Billiot was not struck by Tousis's car. Because Billiot accepts Aleia's version of the facts for summary judgment purposes, none of these disputes are material to the legal analysis in this claim for qualified immunity.

To summarize, for the purposes of the qualified immunity analysis, the material undisputed facts demonstrate that Agent Billiot pulled in front of Tousis shortly after Tousis engaged in a reckless, high-speed flight from police officers after leaving a suspected drug house; that Billiot exited his car and ran toward Tousis, placing himself fewer than two car lengths from the front of Tousis's car, shouting commands to turn off and exit the vehicle; that Tousis, turning his wheels to the right, began to move forward; and that Billiot then fired the fatal shot, fearing both for his own safety and for that of the public if Tousis resumed his reckless flight.

That brings us to the basis for the appeal: Aleia Tousis sued Billiot under 42 U.S.C. § 1983, alleging that Billiot

violated her father's rights under the Fourth Amendment when Billiot used excessive force to effect a seizure of her father. Billiot moved for summary judgment on the grounds of qualified immunity. The district court denied the motion, and Billiot appeals.

## II.

On appeal, Billiot contends that he is entitled to qualified immunity as a matter of law. Specifically, he asserts that he did not violate Tousis's Fourth Amendment rights when he fired the shot, and that it was not clearly established at the time of the incident that the use of deadly force in these circumstances violated the Fourth Amendment. Although an order denying summary judgment is generally not a final decision within the meaning of 28 U.S.C. § 1291, and is thus not usually immediately appealable, the general rule does not apply when the summary judgment motion is based on qualified immunity. *Plumhoff*, 572 U.S. at 771. Because qualified immunity is immunity from suit rather than a defense to liability, pretrial orders denying qualified immunity generally fall within the collateral order doctrine. *Plumhoff*, 572 U.S. at 771–72. The questions presented here, namely, whether Billiot violated the Fourth Amendment and whether his conduct violated clearly established law, are purely legal and so appellate review is appropriate. *Plumhoff*, 572 U.S. at 773. We review the district court's denial of summary judgment *de novo*, examining the record in the light most favorable to the nonmovant and construing all reasonable inferences from the evidence in her favor. *Anderson*, 477 U.S. at 255; *Tolliver v. City of Chicago*, 820 F.3d 237, 241 (7th Cir. 2016). Summary judgment is appropriate when there are no genuine disputes of material fact and

the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Tolliver*, 820 F.3d at 241.

There are two inquiries in determining whether qualified immunity applies: whether the facts, taken in the light most favorable to the party asserting the injury show that the officer's conduct violated a constitutional right; and whether the right at issue was "clearly established" at the time of the officer's alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *see also District of Columbia v. Wesby*, 583 U.S. 48, 62–63 (2018) (officers are entitled to qualified immunity under section 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time). Although the Supreme Court considers it beneficial to consider the first prong of the test before engaging with the second, courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236. Aleia claims that Billiot employed excessive force in effecting a seizure of Tousis, a claim that is analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989).

We exercise our discretion to focus on the second prong of the qualified immunity test in deciding this issue: whether Billiot's use of deadly force in this situation violated clearly established law. "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful. *Gupta*, 19 F.4th at 1000 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The Supreme Court has held that "[w]here the officer has probable cause to believe that the

suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985); *see also Tolliver*, 820 F.3d at 245 (same). The fact-specific nature of whether an officer used excessive force depends on the totality of the circumstances surrounding the encounter. *Tolliver*, 820 F.3d at 245; *Scott v. Edinburg*, 346 F.3d 752, 756 (7th Cir. 2003).

> If a suspect threatens the officer with a weapon, that risk of serious physical harm has been established. … In assessing whether force was excessive, we must analyze the actions of the officer from the objective perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. … Moreover, the reasonableness calculus must allow for the fact that officers are often forced to make split-second decisions about what amount of force is necessary in circumstances that are tense, uncertain and rapidly evolving.

*Tolliver*, 820 F.3d at 245 (citations omitted).

An automobile may be used as a deadly weapon. *Tolliver*, 820 F.3d at 245; *Scott*, 347 F.3d at 757. As is the case here, in *Tolliver*, the plaintiff was a driver who was involved in an altercation with police officers attempting to make an arrest. In remarkably similar circumstances, the officers who fired the shots that injured Tolliver were fewer than two car lengths away and on foot when Tolliver's car began to move forward in the general direction of the officers. As is the case here, one of the officers was injured when he fell as he tried to evade the moving car. Tolliver asserted that he was moving forward

at only three miles per hour, too slowly to injure the officers, but we noted that the officers had only seconds to react and could not know whether Tolliver would accelerate and close the distance more quickly, shortening the space and time in which to react. They knew only that they had stopped a car being driven by a man purportedly transporting cocaine, and that the man had responded by first backing up and then by moving towards them as they stood in front of the car. We concluded that qualified immunity applied to the officers' actions because "[r]easonable officers in their circumstances would have perceived the car as a deadly weapon that created a threat of serious physical harm." *Tolliver*, 820 F.3d at 246.

As in *Tolliver*, Billiot was immediately in front of Tousis's car, much less than two car lengths away, when the vehicle began to move forward. That the wheels were turned to the right does not change the calculus. First, in a very small space, even a car maneuvering to the right poses a serious danger to a person standing in front of it. Cars making turns do not proceed horizontally; they follow an arc, and the undisputed evidence establishes that Billiot was standing very close to the front end of Tousis's car when it began to move forward and to the right. Indeed, Aleia repeatedly faults Billiot for placing himself in the zone of danger. Response Brief at 11; R. 62, at 13, ¶ 44. Second, Billiot had no way of knowing whether Tousis would change direction or accelerate. As in *Tolliver*, a reasonable officer in these circumstances would be in fear of being hit by the moving vehicle.

Aleia Tousis is convinced that her father did not intend to hit the officer but was simply trying to "evade Agent Billiot." Response Brief at 20. Even if we assume that Aleia's speculation is correct, Billiot had no way of knowing Tousis's

intentions and was forced to react in a matter of seconds to Tousis's actions based on what Billiot knew at the time. Billiot knew that Tousis had already fled law enforcement once, only minutes earlier, at reckless speeds, weaving in and out of traffic, endangering the lives of officers in pursuit and members of the public with whom he shared the road. Billiot was concerned not only for his own safety but for that of the public because of Tousis's extremely reckless flight. In *Plumhoff*, the Supreme Court addressed whether a suspect's reckless flight justified the use of deadly force after a pause in the chase and an attempt to resume flight:

> [T]he chase in this case exceeded 100 miles per hour and lasted over five minutes. During that chase, Rickard passed more than two dozen other vehicles, several of which were forced to alter course. Rickard's outrageously reckless driving posed a grave public safety risk. And while it is true that Rickard's car eventually collided with a police car and came temporarily to a near standstill, that did not end the chase. Less than three seconds later, Rickard resumed maneuvering his car. Just before the shots were fired, when the front bumper of his car was flush with that of one of the police cruisers, Rickard was obviously pushing down on the accelerator because the car's wheels were spinning, and then Rickard threw the car into reverse "in an attempt to escape." Thus, the record conclusively disproves respondent's claim that the chase in the present case was already over when petitioners began shooting. Under the circumstances at the moment when the

> shots were fired, all that a reasonable police of-
> ficer could have concluded was that Rickard
> was intent on resuming his flight and that, if he
> was allowed to do so, he would once again pose
> a deadly threat for others on the road.

*Plumhoff*, 572 U.S. at 776–77. In those circumstances, the Court concluded that the police acted reasonably in using deadly force to end that risk. 572 U.S. at 777.

Once again, the circumstances are remarkably similar to the situation presented here. Tousis had engaged in a lengthy, reckless flight at speeds in excess of 114 miles per hour, weaving in and out of traffic as he fled officers who were forced to abandon the pursuit in the interest of public safety. By Aleia's own admission, at the time that Billiot fired the shot, Tousis was maneuvering to the empty right lane in order to evade the police once again. A reasonable officer could have concluded both that Tousis was intent on resuming his flight and that he would again pose a serious danger to public safety. In light of *Tolliver* and *Plumhoff*, Billiot's actions thus did not violate clearly established law; in fact, established law holds to the contrary that the officer's actions were objectively reasonable in substantially similar situations.

Aleia's arguments to the contrary do not withstand scrutiny. Because we have elected to decide the case on the second prong of the qualified immunity analysis, we need not engage the appellant's arguments related to the first prong, whether Billiot violated Tousis's Fourth Amendment rights. We consider instead only Aleia's arguments related to whether Billiot violated clearly established law by using deadly force in these circumstances. On the issue of the use of deadly force when there is a danger to the officer, Aleia relies on *Estate of Starks*

*v. Enyart*, 5 F.3d 230 (7th Cir. 1993). She contends that *Starks* clearly established that deadly force could not be used against a non-threatening individual when the officer created the encounter that ostensibly permitted the use of deadly force. As for the use of deadly force when an individual poses a serious risk to the public, Aleia argues that *Plumhoff* is distinguishable.

In *Starks*, the plaintiff stole a taxicab and drove it to a nearby fast-food parking lot. *Starks*, 5 F.3d at 232. Three uniformed officers arrived in two marked police cars and parked both cars behind the cab. The officers then surrounded the car —one officer stood in front of the car but behind a utility pole, one stood behind the car, and one stood next to the driver's door—and confronted Starks. Starks refused an order to exit the cab, and tussled with an officer who opened the driver's door, pulling it closed again and locking the doors. After Starks ignored a second order to exit the cab, he put the car in reverse and slowly backed into the police car parked behind him. He then drove forward and to the right but was blocked by a utility pole. Starks then backed up to the left to improve his position relative to the utility pole, put the car in drive, and floored the accelerator. Starks would have cleared the pole had he been allowed to continue but the officers fired on the car and Starks died as a result of his wounds.

The parties disputed whether the officer in front of the car emerged from behind the relative safety of the utility pole before or after the car began to move, a question that we found material to the qualified immunity analysis. Examining the totality of the circumstances, we noted that Starks' underlying crime was not accomplished violently. Although Starks was attempting to flee, he had not menaced an officer or civilian

with a weapon, at least not until an officer appeared in front of the car. Starks had not initially maneuvered the cab in so reckless a manner that a reasonable officer would fear for his safety or that of the community. The plaintiff conceded that if the officer had moved in front of the car before Starks began to drive forward, then the officers would have been justified in firing their weapons. The plaintiff also conceded that a reasonable officer could have moved out from behind the pole after the cab had begun moving forward if there was enough time for Starks to stop the cab before striking him.

But the factual dispute regarding the sequence of events made it impossible to decide the qualified immunity question at the summary judgment stage:

> The key dispute for the factfinder will be whether [the officer] stepped in front of Starks' rapidly moving cab, leaving Starks no time to brake. If he did, then [the officer] would have unreasonably created the encounter that ostensibly permitted the use of deadly force to protect him, because the decedent would have been unable to react in order to avoid presenting a deadly threat to [the officer]. On the other hand, if [the officer] was in the path of the car before the car started forward or if the factfinder concludes that Starks could have braked but chose not to, then the three defendants reasonably responded to Starks' acceleration toward [the officer]. Starks would have threatened the life of a police officer, and reasonable officers could believe that the use of deadly force was appropriate.

*Starks*, 5 F.3d at 234. Noting that there is no seizure more intrusive than one effected by deadly force, we concluded that, "[i]f a fleeing felon is converted to a 'threatening' fleeing felon solely based on the actions of a police officer, the police should not increase the degree of intrusiveness. In other words, we have no countervailing governmental interest in unreasonable police conduct that would justify a greater intrusion on the individual's rights." *Starks*, 5 F.3d at 234.

Aleia contends that Billiot created the danger by leaving the relative safety of his police car to stand in front of Tousis's car, knowing that Tousis's vehicle might strike him. According to Aleia, under *Starks*, Billiot unreasonably placed himself in danger by running toward Tousis's car and threatening Tousis with deadly force. Aleia concedes that, if an individual is driving towards an officer, then the officer is justified in using deadly force and will be protected by qualified immunity. Under *Starks*, she contends, an officer may not step into the path of the vehicle and unreasonably create the threat that then justifies the use of deadly force. But her contention is missing an important word that distinguishes *Starks* from this case: *Starks* hints only that an officer may not step into the path of a *moving* vehicle and then justify the use of deadly force by claiming to be threatened by the use of the car as a deadly weapon. In this instance, Billiot exited his car to stand before a *stationary* vehicle that was initially blocked in by traffic. Billiot did not create the danger; Tousis did when he began to move forward toward the officer. *Starks* thus did not place the constitutional question confronted by Agent Billiot beyond debate. *Plumhoff*, 572 U.S. at 779. He was not on fair notice that the use of deadly force was unreasonable in these circumstances, and he was therefore entitled to qualified immunity. *Id.*

Aleia's attempts to distinguish *Plumhoff* are equally una-
vailing. She argues that her father had not committed a vio-
lent crime, posed no danger to the public, was stopped in traf-
fic behind two vehicles and a red light, was not driving at high
speed, and was not involved in an active police chase at the
moment the shot was fired. Much of this argument ignores
the undisputed facts. Like Rickard, the fleeing driver in *Plum-
hoff*, Tousis had fled from the police only minutes earlier by
driving recklessly at speeds in excess of one hundred fourteen
miles per hour, weaving in and out of traffic. As in *Plumhoff*,
there was a pause in the pursuit and the driver was then
poised to resume flight. By attempting to resume flight, Tou-
sis posed a danger not only to the public but to the officer who
stood in front of Tousis's car, or so a reasonable officer could
have concluded. Aleia contends that it cannot be conclusively
determined that her father intended to resume his flight, but
that is not the relevant question; the question is whether an
officer in this situation could reasonably conclude that the
driver was attempting to resume his reckless flight. Billiot had
cut off Tousis's path forward, displayed his rifle and ordered
Tousis to turn off the car and exit. When Tousis ignored those
orders and began to pull forward and to the right where the
lane of traffic was open, a reasonable officer could conclude
that he was attempting to resume his reckless flight. Tousis
had already displayed an alarming disregard for human life
by fleeing at a perilous speed while weaving in and out of
traffic. Nothing in *Plumhoff* placed Billiot on notice that he
could not use deadly force in these circumstances.

In sum, in the circumstances presented here, Billiot had an
objectively reasonable belief that his own life and the lives of
the public were at risk when he fired the shot that killed Tou-
sis, and there was no case law warning Billiot that his actions

under those circumstances amounted to excessive force in violation of the Fourth Amendment. Billiot was therefore entitled to summary judgment on his claim of qualified immunity. We reverse and remand with instructions to enter judgment in favor of Agent Billiot on the basis of qualified immunity for the claim of excessive force.

REVERSED AND REMANDED.