In the

# United States Court of Appeals
## For the Seventh Circuit

No. 23-1665

LORENA E. BOSTIC,

*Plaintiff-Appellant,*

*v.*

CLARENCE D. MURRAY and JAN PARSONS,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:15-CV-429 — **Joshua P. Kolar**, *Circuit Judge.*

ARGUED JANUARY 17, 2024 — DECIDED NOVEMBER 21, 2025

Before FLAUM,† EASTERBROOK, and PRYOR, *Circuit Judges.*

---

\* We have modified the caption to reflect the defendants-appellees who remain in the case. Bostic appeals only the entry of summary judgment in favor of Clarence Murray and Jan Parsons, so she has abandoned claims against any other defendant. *See Wells v. Caudill*, 967 F.3d 598, 600 (7th Cir. 2020).

† Circuit Judge Flaum passed away on December 4, 2024, so this appeal is being resolved by a quorum of the panel. *See* 28 U.S.C. § 46(d).

PRYOR, *Circuit Judge.* Invoking 42 U.S.C. § 1983, Lorena Bostic sued individuals in the Lake County Superior Court and Lake County Probation Office (Indiana) after her probation officer, Miroslav Radiceski, raped her. Bostic alleged that the supervisors were deliberately indifferent of her wellbeing by assigning Radiceski to supervise her despite knowing Radiceski's prior inappropriate interactions with another female probationer. The district court granted summary judgment in favor of the supervisors, and we affirm.

## I.    BACKGROUND

We construe the record in the light most favorable to Bostic, the nonmoving party, and construe all reasonable inferences from the evidence in her favor. *Tousis v. Billiot*, 84 F.4th 692, 697 (7th Cir. 2023).

### A. Factual History

At all times relevant to this case, Lorena Bostic was on probation in Lake County, Indiana, having been placed on probation by Lake County Superior Court Judge Clarence Murray in 2011. In late 2012, Miroslav Radiceski with the Lake County Probation Office was assigned to supervise Bostic.

Radiceski's supervisors—chief probation officer Jan Parsons and Supervising Judge Clarence Murray—knew that Radiceski had a checkered past. In mid-2011, a female probationer, identified by the parties as A.R., reported to Chief Probation Officer Parsons that Radiceski had behaved inappropriately toward her. A.R. recounted that, during a probation meeting, Radiceski had asked her several unusual questions—including whether she was married, the last time she had sex, and how many tattoos she had. Afterward, Radiceski guided A.R. to the top of a secluded stairwell. There, he asked

A.R. to lift her shirt and lower her pants, revealing all her tattoos. Radiceski then personally moved A.R.'s clothing to get a second view of her tattoos.

After A.R. reported this incident and requested a different supervising probation officer, Parsons sought to verify the details. She interviewed A.R. and consulted with the head of security to check for a video recording from the stairwell but none existed. Parsons also spoke with Radiceski, who provided a written statement denying the allegations. Given the conflicting evidence, Parsons was unable to determine whether the incident "actually did happen" as alleged. In the end, Parsons—after consulting with Judge Murray—decided to grant A.R.'s request, assigning her a new, female probation officer.

Still, Parsons and Judge Murray decided not to suspend, fire, or retrain Radiceski given their view that A.R.'s complaint was only "an allegation"—the "first" against Radiceski—for which there was "no proof." Parsons, however, temporarily barred Radiceski from supervising any female probationers. Parsons noted that this was the only gender-specific restriction that she could recall in her thirty-year career. But this solution was not meant to be a long-term fix; Radiceski would gradually resume supervising female probationers.

During the restriction period, Radiceski was still permitted to handle "intakes" for female probationers, meaning that he guided new arrivals to the probation office. According to Parsons, Radiceski generally performed these duties without incident. Parsons noted one concerning episode, though. While performing an intake, Radiceski persistently asked to

oversee a female probationer who had some mental health issues. Parsons repeatedly denied his requests.

After about a year-and-a-half of the restriction, a shortage of probation officers prompted Parsons to assign Radiceski a few female probationers. Among these was Bostic in late 2012. It appears that Bostic's first several interactions with Radiceski were unremarkable. This changed at the end of March 2013, however. During a routine meeting, Radiceski put his hand on Bostic's leg, which made her uncomfortable. She removed his hand from her leg, said "can you please not do that," and then left the meeting.

Days later, Bostic received a letter indicating that Radiceski filed a petition to revoke her probation, a move that could have led to her serving three years in prison. It seemed to Bostic that Radiceski filed this petition as payback for rebuffing his advances. During an appointment to discuss the pending revocation petition, Radiceski told Bostic not to worry about the petition and then said, "Only I can help you, you know, like … you need me."

With the potential for prison time looming, Bostic continued to attend probation meetings with Radiceski. Things got worse. During every appointment Bostic attended after Radiceski filed the petition to revoke her probation, Bostic testified, Radiceski would "nonconsensually" grope her body. He would squeeze her breasts and her buttocks. He put his hands in her pants. Bostic did not report these incidents to anyone in the probation office because "they're all friends," and she did not want to risk going to prison.

Following a hearing on the revocation on November 26, 2013, Radiceski told Bostic to follow him. Bostic assumed they

were going to Radiceski's office, but instead, he led her down a hallway and into a stairwell. After reaching the top of the stairwell, Radiceski grabbed Bostic, pushed on her head, and forced her to perform oral sex on him. He told Bostic to get up, and then he raped her.

The next day, Bostic called a rape hotline and sought medical attention at a hospital. Within a week, Radiceski was suspended with pay, pending a police investigation. By the end of December 2013, Radiceski was fired.

The next year, Radiceski was indicted for five criminal counts, including criminal deviate conduct and official misconduct. *Indiana v. Radiceski*, No. 45G03-1408-FB-000051 (Lake Sup. Ct.). Radiceski pled guilty to one count of official misconduct and was sentenced to three years' incarceration, served on electronic monitored home detention. *Id.*

**B. Procedural History**

Bostic sued Radiceski, Chief Probation Officer Parsons, Judge Murray, and several other state and county defendants, asserting claims under 42 U.S.C. § 1983 in the United States District Court for the Northern District of Indiana. According to Bostic, Radiceski's sexual misconduct violated her right to "personal security and bodily integrity" as secured by the Fourteenth Amendment's Due Process Clause. She also asserted that Parsons and Judge Murray were liable "due to their facilitating of Radiceski's sexual assault and rape against her as well as for failing to protect her from Radiceski" under a theory of supervisory liability.

Almost two years into this lawsuit, during a telephonic status conference, Magistrate Judge Paul Cherry was advised that the parties "orally consent to the jurisdiction of the

magistrate judge" and the case proceeded.[1] More than two years later, on December 31, 2018, Magistrate Judge Cherry retired. Then-Magistrate Judge Kolar was assigned to the case, and he assumed jurisdiction. Judge Kolar gave the parties thirty days "to object to [his] continued exercise of jurisdiction." The order added that "[t]he failure to timely file an objection to the continued exercise of jurisdiction … shall operate as consent to [Judge Kolar's] jurisdiction." No party filed an objection.

In due course, on January 23, 2023, Judge Kolar entered summary judgment in favor of several defendants, including Chief Probation Officer Parsons and Judge Murray. *Bostic v. Vasquez*, 652 F. Supp. 3d 971 (N.D. Ind. 2023). As relevant here, the court ruled that Parsons and Judge Murray were entitled to qualified immunity because no clearly established law put them on notice that their conduct was unconstitutional. *Id.* at 990–94. Bostic's claims against Radiceski proceeded to trial on February 27, 2023. The jury returned a $750,000 verdict in favor of Bostic. The same day, the clerk of court entered judgment against Radiceski. No judgment was ever entered in relation to the claim against Parsons or Judge Murray.

Bostic now appeals the entry of summary judgment for Parsons and Judge Murray.

---

[1] "Magistrate judges may conduct civil trials and enter final judgments, if all of the parties consent." *Mark I, Inc. v. Gruber*, 38 F.3d 369, 370 (7th Cir. 1994) (citing 28 U.S.C. § 636(c)). See also District Ct. Dkt. 71, Telephonic Summary.

## II.    ANALYSIS

### A. Preliminary Issues

Before getting to the merits of Bostic's appeal, we address two preliminary matters.

#### 1. *Magistrate Judge Jurisdiction*

The first issue is whether then-Magistrate Judge Kolar had jurisdiction to rule on the summary judgment motion.

In civil litigation, parties can consent to let a magistrate judge preside over a case and issue final decisions. 28 U.S.C. § 636(c)(1). Consent to a magistrate judge's authority can be either express or implied, at least where the parties have notice of their right to refuse. *Marion HealthCare, LLC v. S. Illinois Hosp. Servs.*, 41 F.4th 787, 790 (7th Cir. 2022); *see also Stevo v. Frasor*, 662 F.3d 880, 883 (7th Cir. 2011). For consent to be implied, though, the parties must have notice of their right to refuse and engage in "*some*" concrete action—such as appearing and participating in a case after being told about the consequences." *Coleman v. Lab. & Indus. Rev. Comm'n of Wisconsin*, 860 F.3d 461, 470 (7th Cir. 2017) (citing *Roell v. Withrow*, 538 U.S. 580, 586–90 (2003)).

Here, the parties litigated the case before two magistrate judges. The parties verbally consented "to the jurisdiction of the magistrate judge," and Magistrate Judge Cherry accepted this notification as if the parties had executed the appropriate written form.[2] Following the case's transfer, Judge Kolar gave

---

[2] District Ct. Dkt. 21, Consent Form, which provides,

> In accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and [Northern District of Indiana] Local Rule 72-1, the parties in this case voluntarily consent to

the parties thirty days "to object to [his] continued exercise of jurisdiction," however, no one did.[3] Based on the parties' litigation conduct following this notice, we find the parties impliedly consented to Judge Kolar's jurisdiction. *Roell*, 538 U.S. at 586–90; *Marion HealthCare*, 41 F.4th at 790. So, Judge Kolar had the authority to rule on the summary judgment motion and enter a final, appealable order.

*2. Timeliness of the Appeal*

On January 23, 2023, Judge Kolar entered summary judgment for Parsons and Judge Murray. Recall, more than a month later, the court presided over a jury trial that resulted in a verdict against Radiceski.[4] The same day the jury rendered its verdict—February 28—the clerk of court's entry of judgment was entered.[5] This judgment said, in relevant part, that "[t]he court has ordered that … Lorena E. Bostic recover from defendant Miroslav Radiceski the amount of seven hundred and fifty thousand dollars … , plus post-judgment interest." (Id.). This judgment was incomplete; it did not include the outcome of Bostic's claims against the other six defendants, including Parsons and Judge Murray.

"Federal Rule of Civil Procedure 58 requires that a judgment by a district court be set forth in a separate document." *Brown v. Fifth Third Bank*, 730 F.3d 698, 699 (7th Cir. 2013)

---

have a United States Magistrate Judge conduct all further proceedings in this case, including … entry of a final judgment ….

[3] District Ct. Dkt. 155, Jurisdiction Order.

[4] District Ct. Dkt. 285, Jury Verdict.

[5] District Ct. Dkt. 287, Clerk's Entry of Judgment.

(citing FED. R. CIV. P. 58(c)(2)(B); FED. R. APP. P. 4(a)(7)(A)(ii)). If, however, the judge fails to enter an order that satisfies the rules, judgment is deemed entered 150 days after the court's final decision. *Id.*; *see also Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468, 491 (7th Cir. 2020) (stating the Federal Rules of Civil Procedure provide a "150-day fail-safe"); *TDK Elecs. Corp. v. Draiman*, 321 F.3d 677, 679–80 (7th Cir. 2003).

Applying those standards here, we treat the judgment, as to Parsons and Judge Murray, as if it were entered on Monday, July 31, 2023, the first business day after the 150th day. *See Bell*, 982 F.3d at 491. That means Bostic's premature notice of appeal, which was filed on March 29, 2023, will "spring forward" to July 31, 2023, the date on which the judgment became final. *Roe v. Elyea*, 631 F.3d 843, 854 (7th Cir. 2011) (citing FED. R. APP. P. 4(a)(2)); *see also Bell v. Kay*, 847 F.3d 866, 868 (7th Cir. 2017). Bostic's appeal is therefore timely, and our jurisdiction is secure.

### B. Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). We review the grant of summary judgment de novo, meaning that we take a fresh look at the facts and the parties' arguments and assess for ourselves whether Parsons and Judge Murray deserve summary judgment. *Doe v. Gray*, 75 F.4th 710, 716 (7th Cir. 2023).

Bostic claims that Parsons and Judge Murray violated her constitutional rights. In particular, she asserts that their actions—choosing to allow Radiceski to supervise female probationers despite his poor track-record with women—

infringed on her right to bodily integrity, which is enshrined within the substantive due process protections of the Fourteenth Amendment. *See Hess v. Garcia*, 72 F.4th 753, 765–67 (7th Cir. 2023); *Albright v. Oliver*, 510 U.S. 266, 272 (1994) (plurality opinion).[6]

Finding Bostic's "supervisory liability" theory failed, the district court granted summary judgment in favor of Parsons and Judge Murray. *Bostic*, 652 F. Supp. 3d at 994–95. The court found these defendants were entitled to qualified immunity, *id.* at 994, which shields government officials like Parsons and Judge Murray from damages in civil suits "so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (internal quotation marks and citation omitted).

The court noted that Bostic could defeat the defense of qualified immunity by showing two things: first, that the facts show a violation of a constitutional right, and second, that the constitutional right was clearly established at the time of the alleged violation. *Bostic*, 652 F. Supp. 3d at 980 (citing, among others, *Holloway v. City of Milwaukee*, 43 F.4th 760, 767 (7th Cir. 2022)). Bostic was unable to do so, however, because she did not cite any cases that showed that "the law was clearly established that Parsons or Judge Murray would have understood

---

[6] In the district court, Bostic also pursued a "failure-to-protect" theory under the Supreme Court's decision in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989). The district court ruled that this theory was unavailable here, as it applies only when public officials fail to protect someone from private violence, not violence by other public officials. Bostic concedes that the district court was correct, so we discuss this no further.

that their conduct would violate Bostic's constitutional right to bodily integrity." *Id.* at 994.

Bostic argues that the district court should not have granted summary judgment to Parsons and Judge Murray. She argues that there was a constitutional violation here: the lackluster response of Parsons and Judge Murray to the report of Radiceski's previous incident of sexual misconduct enabled him to rape her. Moreover, Bostic claims that this conduct was clearly established as being unconstitutional, as any government official would have known that they could not create an environment that allowed sexual violence to flourish.

To determine if Bostic defeated Parsons and Judge Murray's qualified immunity defense, we—like the district court—use a familiar two-part framework, asking: (1) whether the facts, read in Bostic's favor, amount to a constitutional violation and (2) whether the constitutional right was clearly established at the time of the alleged violation. *Tousis*, 84 F.4th at 697. We can address either prong first, *id.*, but we will begin—and end—with consideration of the first question.

### 1. Legal Framework

Bostic believes that Parsons and Judge Murray have violated the United States Constitution because their actions—as supervisors of Radiceski—allowed the rape to occur. She uses the phrase "supervisory liability" to describe her theory, but the Supreme Court has told us that this label "is a misnomer." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). That's because, under *Iqbal*, a supervisor is liable for money damages only for his or her own misconduct. *Id.* at 676. They "may not be held liable

for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Id.* Our focus, then, is on what the supervisors did wrong—and not on Radiceski's misdeeds. *See id.*; *see also Hess*, 72 F.4th at 767–68.

How, exactly, liability for supervisors works in the wake of *Iqbal* is still somewhat unsettled. *See, e.g.,* William N. Evans, *Supervisory Liability in the Fallout of* Iqbal, 65 SYRACUSE L. REV. 103, 106 (2014) (describing post-*Iqbal* caselaw on this issue as "a muddled mess"). Perhaps it's not a surprise, then, that the parties present to us differing standards to apply in this case, neither of which is completely satisfactory. So, we start by providing a roadmap that synthesizes how our court has approached this topic.

To ensure that supervisors are being held liable only for their own actions, we have insisted on two requirements. *See Stockton v. Milwaukee County*, 44 F.4th 605, 619 (7th Cir. 2022). *First*, the supervisor must have been personally involved in the constitutional violation. *Id.*; *Backes v. Vill. of Peoria Heights*, 662 F.3d 866, 869–70 (7th Cir. 2011). This does not necessarily require that the supervisor directly participate in the deprivation, but it does mean that there needs to be a connection between the supervisor's action or inaction and the violation at issue. *Backes*, 662 F.3d at 689–70; *see also Arnett v. Webster*, 658 F.3d 742, 757 (7th Cir. 2011). *Second*, if there is sufficient personal involvement, then the supervisor must have also had the necessary state of mind. *E.g., Locke v. Haessig*, 788 F.3d 662, 669 (7th Cir. 2015). The second inquiry will vary depending on the constitutional provision at issue. *Id.*

*a. Personal Involvement*

Liability for supervisors is individual, not vicarious. For that reason, simply being atop an organizational food chain does not make a supervisor liable for a subordinate's unconstitutional conduct. *E.g.*, *Doe v. Purdue Univ.*, 928 F.3d 652, 664–65 (7th Cir. 2019) (affirming dismissal of claim against university president because there was no allegation that he knew about the conduct at issue, "much less that he facilitated, approved, or condoned it"); *Brown v. Randle*, 847 F.3d 861, 865 (7th Cir. 2017) (affirming dismissal of claim against prison warden because plaintiff did not contend that warden "had anything to do with the timing of his visits to the university health center"); *Vinning-El v. Evans*, 657 F.3d 591, 592 (7th Cir. 2011) (reversing denial of summary judgment of claim against prison warden because plaintiff "does not contend that [the warden] made or ratified the decision about his diet").

Instead, for there to be personal involvement, there must be at least "some causal connection or affirmative link between the action complained about and the official sued." *Arnett*, 658 F.3d at 757 (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). In other words, the supervisor must have either caused or participated in the constitutional deprivation at issue. *Milchtein v. Milwaukee County*, 42 F.4th 814, 824 (7th Cir. 2022); *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996).

*b. State of Mind*

Even if a supervisor was personally involved in a constitutional violation, she still must have acted with the necessary state of mind to be liable. The factors necessary to hold a supervisor liable "depend upon the constitutional provision at

issue, including the state of mind required to establish a violation of that provision." *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015); *Iqbal*, 556 U.S. at 676.

When a plaintiff pursues a substantive due process theory, the requisite state of mind is deliberate indifference. *See Vance v. Rumsfeld*, 701 F.3d 193, 204 (7th Cir. 2012) (en banc) (applying deliberate-indifference standard in supervisory liability case with substantive due process theory). That's because the "deliberate-indifference standard … is the general standard applicable to claims arising under substantive due process." *Martinez v. Santiago*, 51 F.4th 258, 262 (7th Cir. 2022) (citing cases). Deliberate indifference is also the right standard when supervisors are accused of imposing unconstitutional conditions of confinement in violation of the Eighth Amendment. *Haywood v. Hathaway*, 842 F.3d 1026, 1033 (7th Cir. 2016).

In other scenarios, however, deliberate indifference is not required. One such example is in the equal protection context: A plaintiff who was fired because of her race must show that the supervisor who facilitated her termination had "the specific intent to discriminate" because "the state of mind of purposeful discrimination is an element of the violation." *Locke*, 788 F.3d at 669 (citing *Iqbal*, 556 U.S. at 676); *T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010) (same). Another example is when a supervisor allegedly failed to protect a pretrial detainee in jail: The supervisor must have acted in an objectively unreasonable manner before liability attaches under this Fourteenth Amendment theory. *Kemp v. Fulton County*, 27 F.4th

491, 498 (7th Cir. 2022) ("*Kingsley*'s objective-unreasonableness test applies equally to supervisory-liability claims.").[7]

Because Bostic pursues a general substantive due process theory in this case, we focus on the relevant standards for deliberate indifference. *See Martinez*, 51 F.4th at 262. A government official is deliberately indifferent in this context if he "had actual knowledge of impending harm which he consciously refused to prevent." *Hill v. Shobe*, 93 F.3d 418, 421 (7th Cir. 1996). This standard has two main components. The first is knowledge: the official must have "sufficient knowledge of the danger that one can infer he intended to inflict the resultant injury." *Id.* This inquiry focuses on what the official knows, not on what he should have known. *Id.*; *Rumsfeld*, 701 F.3d at 204. The second component is the conscious refusal to prevent the known risk of harm. Incompetence, negligence, and official irresponsibility do not violate the due process clause. *Hill*, 93 F.3d at 421; *Martinez*, 51 F.4th at 262; *West v. Waymire*, 114 F.3d 646, 647 (7th Cir. 1997). Instead, a plaintiff must show that the official made a deliberate decision that

---

[7] Part of the parties' understandable confusion stems from the fact that, prior to the Supreme Court's decision in *Iqbal*, "most circuits required that a supervisor act (or fail to act) with the state of mind of deliberate indifference to be liable, no matter the underlying constitutional violation." *Locke*, 788 F.3d at 669 (citing Evans, *Supervisory Liability*, *supra*, at 117–18 & n.41). Indeed, at least some of our pre-*Iqbal* precedent seems to say this as well. *Id.* at 669–70 (citing, among others, *Nanda v. Moss*, 412 F.3d 836, 842 (7th Cir. 2005)). It's clear now that deliberate indifference is not the *de facto* state of mind for supervisors to be held liable, but can be the correct intent in certain contexts, like our case. *See Rumsfeld*, 701 F.3d at 204; *see also Dodds v. Richardson*, 614 F.3d 1185, 1204 (10th Cir. 2010) (noting that deliberate indifference can, in some circumstances, still be enough for a supervisor to be liable under § 1983—*if* deliberate indifference is the "state of mind required for the constitutional deprivation" at issue).

allowed a constitutional violation to take place. *Hill*, 93 F.3d at 421.

With these standards in mind, we take up Bostic's arguments on appeal.[8]

### 2. Discussion

Bostic argues that Parsons and Judge Murray's actions—most importantly, allowing Radiceski to supervise female probationers after learning of his prior sexual misconduct—subjected them to liability under § 1983. Though we agree that

---

[8] Some of our cases frame the test for supervisory liability a little differently than we have. One common refrain is that a supervisor can be liable if they "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see." *Backes*, 662 F.3d at 870 (citation omitted). This test, we have said, is another way of saying that supervisors must "act either knowingly or with deliberate, reckless indifference" to incur liability. *Id.* (citation omitted).

This formulation, however, predates the Supreme Court's opinion in *Iqbal*, which established that showing deliberate indifference is not always enough to establish liability for supervisors. *Locke*, 788 F.3d at 669–70 (describing impact of *Iqbal* on necessary state of mind for § 1983 supervisory liability); *see Jones v. City of Chicago*, 856 F.2d 985, 992–93 (7th Cir. 1988) (first usage of test); *see also Iqbal*, 556 U.S. at 694–95 (SOUTER, J., dissenting) (describing the test as an option for supervisory liability that the majority decided not to adopt); *Dodds*, 614 F.3d at 1196–98 & n.5 (stating that this test reflects a pre-*Iqbal* understanding of supervisory liability).

Because this test implies that deliberate indifference is always enough to impose liability on a supervisor, we opt not to use it here. Of course, the standard is still sometimes accurate—like when deliberate indifference is enough to impose liability, *see Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017) (using standard in substantive due process context)—but it is not always the most precise. So, we caution courts to examine the underlying constitutional theory and ensure that deliberate indifference is enough to impose liability on the supervisor before using this standard.

Parsons and Judge Murray were personally involved, we conclude that they did not act with deliberate indifference. (Both sides argue that the liability of Parsons and Judge Murray is intertwined, so we consider their liability in tandem.) Their actions may have been unwise, but they did not behave in a way that allows for the inference that they acted with deliberate indifference.

*a. Personal Involvement*

To start, we can easily conclude that Parsons and Judge Murray were personally involved in the alleged constitutional violation at issue. Bostic is not attempting to hold them vicariously liable for Radiceski raping her; instead, her claim revolves around the choices of Parsons and Judge Murray that allowed Radiceski to continue supervising female probationers and the rape to happen. Because of that, we find Bostic demonstrated their personal involvement, as there is at least "some causal connection … between the action complained of"—Radiceski's rape—and "the official[s] sued." *Arnett*, 658 F.3d at 757.

This case is therefore dissimilar to cases like *Doe v. Purdue University*, 928 F.3d at 664–65. There, we held that a university president was not personally involved in a decision to suspend a student because of alleged sexual violence. *Id.* Because the president did not even have knowledge of the situation, he could only be sued under a vicarious liability theory, which is not allowed. *See id.* Here, on the other hand, Bostic attempts to hold Parsons and Judge Murray liable for their own actions—not for anyone else's.

*b. State of Mind*

Even though Parsons and Judge Murray were personally involved, they have not committed a constitutional violation unless the evidence shows that they acted with a sufficiently culpable state of mind. *See Iqbal*, 556 U.S. at 676. Because Bostic has chosen a substantive due process theory to form the basis of her case, we must determine whether Parsons and Judge Murray's actions amounted to—at minimum—deliberate indifference. *Martinez*, 51 F.4th at 262.

Bostic asserts that the evidence shows that they knew that Radiceski was a danger to female probationers, yet they assigned him to supervise her anyway. Because of their deliberate indifference to the danger that Radiceski posed, Bostic argues, she was sexually harassed, sexually assaulted, and eventually raped.

Recall that a government official is deliberately indifferent only if he or she "had actual knowledge of impending harm which he consciously refused to prevent." *Hill*, 93 F.3d at 421. Because this standard requires that the official have "sufficient knowledge of the danger that one can infer he intended to inflict the resultant injury," *id.*, we must start by analyzing what Parsons and Judge Murray knew about Radiceski.

Most prominently, the pair knew about a mid-2011 report from A.R., the female probationer who alleged that Radiceski led her to a secluded stairwell and told her to lift her shirt and lower her pants to reveal her tattoos. A.R. also alleged that Radiceski personally moved her clothes to reveal the same tattoos. This was the extent of their knowledge about that incident, however, because they were unable to discover a video recording of the incident, and Radiceski denied the

allegations. Parsons also knew that Radiceski once persistently asked to oversee a female probationer who had some mental health issues.

In regards to Bostic, however, neither Parsons or Judge Murray were aware of Radiceski's inappropriate contact with her leading up to the rape as Bostic—understandably—did not report the incidents to anyone in the probation office, given that she believed that they were "all friends."

The information they did have, though troubling, is not enough to put Parsons and Judge Murray on actual notice of the risk that Radiceski would eventually grope and rape Bostic. Parsons and Judge Murray seem to have been aware of a risk that Radiceski would act inappropriately toward women, but no reading of the evidence—even in Bostic's favor—reveals that they had the necessary knowledge that he was likely to rape a probationer. *See Hill*, 93 F.3d at 421–22; *West*, 114 F.3d at 651–52. After all, they knew of no other complaints involving Radiceski, and of those they knew, none alleged such violative conduct. *See Rumsfeld*, 701 F.3d at 204 (noting that to show deliberate indifference, a plaintiff must show a public official knew of risks with sufficient specificity).

Our opinion in *Hess v. Garcia* is instructive. 72 F.4th at 768. In *Hess*, a chief of police knew about accusations that an officer had "act[ed] inappropriately 'with females.'" *Id.* Despite this knowledge, he let the officer lead a ride-along with a seventeen-year-old girl. *Id.* at 757, 768. The officer then sexually assaulted and harassed the girl. *Id.* at 757. We held that the police chief's inaction, in the face of that minimal level of knowledge, was not enough to impose liability. *Id.* at 768. So too here.

Even if we assumed that Parsons and Judge Murray knew that Radiceski posed a risk of sexually assaulting and raping female probationers, their response—though far from perfect—does not rise to the level of deliberate indifference. In response to A.R.'s report, they investigated by consulting with security and interviewing both Radiceski and A.R. herself. They then placed Radiceski on a significant restriction, barring him from supervising women for more than a year.

To be deliberately indifferent, an official must have acted in a way that revealed a deliberate choice to allow a constitutional violation to happen. *Hill*, 93 F.3d at 421. The actions of Parsons and Judge Murray, however, show that they took the risk seriously, at least to some extent. They investigated and implemented a male-only restriction on Radiceski that was seemingly unprecedented within the probation department.

To be sure, they could have done more. Eventually, Parsons and Judge Murray relaxed their stance and allowed Radiceski to supervise women again, leading to this reprehensible conduct. But bad, negligent, or irresponsible decisions like these, without more, are not unconstitutional. *Martinez*, 51 F.4th at 262; *West*, 114 F.3d at 647, 650.

"Under our cases, the possibility that [a government official] could have done more does not evince deliberate indifference." *Hunter v. Mueske*, 73 F.4th 561, 567 (7th Cir. 2023). Under Bostic's view, the only way that Parsons and Judge Murray could have avoided liability here is by firing Radiceski or permanently barring him from overseeing women. "The existence or possibility of other better policies which might have been used," however, "does not necessarily mean that the defendant was being deliberately indifferent." *Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000).

Because Parsons and Judge Murray were not deliberately indifferent, they are entitled to qualified immunity.

### III.   CONCLUSION

This is a tragic case, but the only liability is with Radiceski. Parsons and Judge Murray could have done more to prevent Radiceski's abuse of authority, but their behavior did not rise to a level of deliberate indifference. So, they did not violate Bostic's constitutional rights. With these closing remarks, we AFFIRM the district court's grant of summary judgment.